```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3   FOTOMEDIA TECHNOLOGIES          *    Civil Docket No.
                                     *    2:07-CV-255
 4   VS.                             *    Marshall, Texas
                                     *
 5                                   *    May 28, 2009
     AOL, ET AL                      *    9:00 A.M.
 6

 7   FOTOMEDIA TECHNOLOGIES          *    Civil Docket No.
                                     *    2:07-CV-256
 8   VS.                             *    Marshall, Texas
                                     *
 9                                   *    May 28, 2009
     ALLTEL COMMUNICATIONS, ET AL    *    9:00 A.M.
10

11

12           TRANSCRIPT OF CLAIM CONSTRUCTION HEARING
         BEFORE THE HONORABLE JUDGE CHAD EVERINGHAM
13             UNITED STATES MAGISTRATE JUDGE

14

15

16

17   APPEARANCES:

18   FOR THE PLAINTIFFS:        (See sign-in sheet.)

19
     FOR THE DEFENDANTS:        (See sign-in sheet.)
20

21

22   COURT REPORTER:        MS. SUSAN SIMMONS, CSR
                            Official Court Reporter
23                          100 East Houston, Suite 125
                            Marshall, TX   75670
24                          903/935-3868

25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

P R O C E E D I N G S

1

2           COURT SECURITY OFFICER:  All rise.

3           THE COURT:  Please be seated.

4           All right.  We have got a consolidated

5 claim construction hearings set today in 2:07-CV-255,

6 Fotomedia Technologies against AOL and others; and

7 2:07-CV-256, Fotomedia Technologies against Alltel

8 Communications and others.

9           What says the Plaintiff?

10           MR. KITCHEN:  Good morning, Your Honor.

11 Gary Kitchen, McKool-Smith for the Plaintiff, Fotomedia.

12 I have with me my partner, Robert Manley, John Shumaker

13 from our Austin office and Ivan Wang from our Dallas

14 office, as well as Mr. Eric Tautfest, our co-counsel

15 from the Ware firm, and our client representative Mr.

16 Ryan Fry from Fotomedia.

17           I believe the rest in the room is related

18 to the Defendants, Your Honor.

19           And we're ready.

20           THE COURT:  Good morning.  For the

21 Defendants?

22           MR. CHATTERJEE:  Good morning, Your Honor,

23 my name is Neel Chatterjee and I represent the

24 Defendant, Photobucket in the earlier filed case.  With

25 me from my firm is Gabe Ramsey, who is also from our

1  firm representing Photobucket in this matter.

2          MR. HILL:  Good morning, Your Honor.

3  Wesley Hill on behalf of Yahoo, also with Scott

4  Partridge, who will be addressing the Court today on

5  claim construction, Lisa Kelly, and also from Yahoo our

6  client representative, Christiana State.

7          MR. GILLAM:  Your Honor, Gil Gillam, on

8  behalf of Photobucket as well.

9          MR. ERSKINE:  Your Honor, Blake Erskine and

10  Michael Sacksteder for Shutterfly.

11          MS. DOAN:  Your Honor, Jennifer Doan for

12  Alltel Communications, and with me from my firm is Josh

13  Thane and Scott Andrews, and also I have Tom Dunham for

14  Verizon Wireless, Your Honor.

15          MR. DUNHAM:  And Sprint as well.

16          MR. BAUER:  And Your Honor, Steve Bauer

17  from Proskauer-Rose for T-Mobile and Jennifer Ainsworth

18  in the back, also.  We ran out of seats.

19          THE COURT:  It's good to see all of y'all.

20          All right.  I have set aside an hour and a

21  half per side to address the claim construction

22  disputes.  The Plaintiff, you need to use at least half

23  of your time in your opening presentation, otherwise you

24  will be limited to a like amount of time in your

25  rebuttal presentation.

 1              MR. KITCHEN:  Very well, Your Honor.  We

 2  intend to reserve 30 minutes.

 3              THE COURT:  Okay.  Well, I will give you a

 4  warning when you've -- I'll give you a warning when you

 5  have used an hour then.

 6              MR. KITCHEN:  Thank you, Your Honor.

 7              THE COURT:  I'll take a recess at 10:25

 8  today, so if we're at a breaking point around 10:25,

 9  don't be surprised it I have -- it will probably be

10  y'all, if I interrupt you and cut you off.  Our court

11  reporter has another engagement.  Okay?

12              So, with that, Plaintiff, you may proceed.

13              MR. MANLEY:  Good morning, Your Honor,

14  Robert Manley from McKool-Smith on behalf of Fotomedia.

15              THE COURT:  Mr. Manley, good morning.

16              MR. MANLEY:  Let me get all of my

17  accruements out here and get the stop watch going.

18              Judge, there are -- obviously there are

19  claim terms that are common between the '774 and '936.

20  Mr. Kitchens (sic) and I will divide those, and then Mr.

21  Shumaker will divide the -- will address the terms that

22  are relevant to the other patent.

23              The first term that I would like to address

24  is a server.

25              THE COURT:  Tell me how you enabled this

```
 1  distributed system in '96.

 2              MR. MANLEY:  In '96?

 3              THE COURT:  Yes.

 4              MR. MANLEY:  The question that I believe

 5  the Court is raising pursuant to the Defendants'

 6  argument is is -- No. 1 is this an appropriate time to

 7  address enablement?  No. 2, can the Court sitting here

 8  today decide that it was not enabled and therefore limit

 9  the construction of a server to only one server?

10              THE COURT:  Can I decide whether or not

11  multiple servers that perform these steps was disclosed

12  in the context of claim construction?

13              MR. MANLEY:  I believe you can look to the

14  specification and the claims and see that a server --

15  there is no intent to limit the term a server to only

16  one server, and there is no basis therefore to depart

17  from the claim construction rule that a server means one

18  or more, that's No. 1.  And then with respect to the

19  enablement argument, actually, Judge, let me bring to

20  your attention a recent claim construction order that

21  came out of this court, Judge Davis.

22              May I approach?

23              THE COURT:  Yes.

24              MR. MANLEY:  Where the Defendants raised --

25  here are some copies for you also.
```

 1                    MR. CHATTERJEE:  Can we have a copy of your

 2   slides?

 3                    MR. MANLEY:  Absolutely.

 4                    Judge, this is the claim construction order

 5   that Judge Davis issued, I think in April of this year,

 6   April 2009.  And the Defendants made the exact same

 7   enablement argument at the claim construction stage.

 8   Basically it is their opinion is that the -- there was

 9   something that was difficult to perform at the time, the

10   patent did not disclose how to do that, and therefore

11   the claims could not be construed to include whatever

12   the defendants decided should be -- should have been

13   enabled.

14                    And Judge Davis on page 9 of your opinion

15   there, and I have highlighted it for the Defendants and

16   for the Plaintiffs, turned directly to the heart of the

17   matter in Footnote 11, when entertaining this enablement

18   argument at the claim construction phase.  And said,

19   enablement inquiry -- the enablement inquiry implicates

20   claim construction.  The Courts first construe the

21   asserted claims before determining whether the

22   specification enables those claims.

23                    So Step No. 1 is construction.  But more

24   importantly if you will look at -- on the left hand

25   column there on page 8.  Defendants enablement arguments

1  are unsupported.

2           Down at the bottom right before Footnote

3  11, the court -- this court stated whether the

4  specification enables the claimed invention is a highly

5  factual inquiry that requires the court to determine:

6  One, the level of skill in the art and the knowledge an

7  ordinary skilled artisan possessed when the inventors

8  filed the application that matured into the patents in

9  suit.  Two, the full scope of the claimed invention,

10 which relates back to the full scope after construction.

11 You see it refers back to 11.  And three, the level of

12 experimentation that constitutes undue experimentation.

13 Defendants address none of these inquiries.

14           Defendants here address none of those

15 inquiries.  So even if the Court asks the questions,

16 gets to the point where it says, what's enabled?  The

17 question of whether it was enabled or not or should have

18 been -- actually more importantly, should have been

19 enabled by the patent, the burden is upon the Defendants

20 to come forward with these elements of evidence, and the

21 Defendants have not done that.

22           THE COURT:  Okay.  Well, my question to you

23 though is -- I understand in general what enablement law

24 requires.

25           MR. MANLEY:  Yes, Your Honor.

1           THE COURT:  What's your position as to how

2  this distributed system is enabled?

3           MR. MANLEY:  I don't think that there is a

4  disclosure in the patent that enables a distributive

5  system.  I think the answer is there was no necessity

6  for that.  The specification clearly states that -- let

7  me get to the slide and I'll show you the quote.  And

8  this is in the summary of the invention, Judge.

9           Actually, Chris, could you take me to Slide

10  8.  Slide 8.  Maybe I can get there.

11           Summary of the Invention.  The present

12  invention is a system and method for processing

13  electronic image data.  The system comprises at least

14  one server computer connected to the network.

15           So the summary of the invention clearly

16  anticipates more than one server.  If you look beyond

17  the summary of the invention, in the specification to

18  the preferred embodiments, even the preferred

19  embodiments talk about server systems, not a single

20  server.  And Defendants in their argument point to this

21  diagram, 31, and say, a-ha, look, a line is draw around

22  all of the functions of 31, and therefore it's got to be

23  in one server or one box.  But if you look back to the

24  description, and this is the preferred embodiment -- is

25  merely a preferred embodiment, when the patent talks

1   about what 31 is, it's a server system or server

2   systems.  So the patent clearly discloses that the steps

3   can be performed by multiple servers, and the question

4   of whether it needed to disclose how, the answer is no.

5   This is claim construction, that is an issue for another

6   day.  And secondly, the elements that the Defendants

7   would have had to have come forward with to win the day

8   on that argument, they simply have not done that in this

9   proceeding.

10          So, the Defendants' attempt to graft on the

11  limitation of one server or limiting it to one server

12  should be rejected, and the general rule that a whatever

13  means one or more should prevail here.

14          The two -- there are two cases that are

15  also addressed in the briefing.  One is the Norian

16  Corporation and the Insituform Technologies case.  Both

17  of them are instructive into -- as to what the

18  Defendants would have to show in order to limit a server

19  to one and only one server.  And as the Federal Circuit

20  taught in the 1996 Insituform Technologies case, the

21  article should be limited to only one if interpreting or

22  construing the claim to mean one or more than one would

23  eliminate an inherent feature of the invention.

24          Again, the Defendants have not shown an

25  inherent feature of the invention that would be

1  eliminated by interpreting the claim consistent with the

2  specification which is one or more servers.

3          THE COURT:  Does the patentee use the

4  phrase at least one differently from the word a?  Some

5  portions of the claim use the phrase at least one, and

6  the server limitation uses the word a in front of it.

7  Is there a distinction there that I should draw?

8          MR. MANLEY:  No, Your Honor.  The --

9          THE COURT:  Why did he use different terms?

10         MR. MANLEY:  The summary of the invention

11 is instructive to this point.  The first time that a

12 server is mentioned, the drafter of the patent, the

13 patentee, said at least one server computer in the

14 summary of the invention.  And thereafter refers back to

15 the at least one server computer as the server or a

16 server.  That is consistent with the way that the claims

17 were written insofar as the first time in the summary of

18 the invention that the server is mentioned, the drafter

19 makes clear it is at least one server.  The server or a

20 server relate back to at least one server.

21         And the different terms -- I think the

22 Court's question was the server or a server, were those

23 used differently in the claims, and the answer is yes.

24 But I believe they relate back to the summary of the

25 invention which is at least one server.

1          THE COURT:  Well, my question was phrased

2   at least one, is that different from a?

3          MR. MANLEY:  No, I don't believe that it

4   is, Your Honor.

5          THE COURT:  Okay.  And why didn't he use

6   corresponding language in the claims that he used in the

7   specification?

8          I mean, your argument is that they mean the

9   same thing, correct?

10          MR. MANLEY:  Yes, Your Honor.  The general

11   rule as he knew when he was drafting the claim was that

12   a means one or more, and I believe that's -- you know,

13   I'm obviously not a mind reader, but I believe that

14   would be consistent with why he used the language that

15   he did.  There is no clear intent to limit server to one

16   server.

17          The second term that I would like to

18   address, Your Honor, is -- let me get there.

19          THE COURT:  Well, if he knew that rule, why

20   did he then switch gears and use at least one in other

21   portions of the claims?

22          MR. MANLEY:  Oh, I'm sorry.  The other

23   portions of the claims where he said at least one, do

24   not address server.  They address other things.

25          THE COURT:  I know, but if he knew the rule

1  that a means more than one, then why did he switch gears

2  and use at least one --

3              MR. MANLEY:  And use the other?  Those

4  other things, I don't believe, appear in the

5  specification with that language, at least one.  So, the

6  drafter used that when he needed to make clearer that he

7  was talking about something there needed to be at least

8  one.  Server, he had already done that in the summary of

9  the invention.  So it was consistent to refer back to

10 that definition in the summary of the invention.

11             The second term that I would like to

12 address, Your Honor, is the receiving the image data

13 embodying an electronic image, the image data

14 transferred under control of the user at the sending

15 computer.  I believe the fundamental question here is is

16 this a distributed or divided claim or is it a claim

17 that the drafter focused on what the server did?

18             THE COURT:  It's from the servers

19 perception is your argument, right?

20             MR. MANLEY:  Yes, Your Honor, it is.

21             THE COURT:  It's how the claim language is

22 drafted.

23             MR. MANLEY:  Correct, yes, sir.

24             The claim language is directed to what the

25 server does and what the server receives.  The server --

 1  the preamble of Claim 1 of the '774 is the server

 2  executing the steps of, that's clear.  Receiving image

 3  data, that's clear, that's the server or server system.

 4  The image data transferred under the control of the user

 5  at the sending computer is what's received by the

 6  server.  It's not directed to a third party, requiring a

 7  third party to send image data.

 8            And the reason that we know that the

 9  drafter had the choice of either dividing the claim or

10  focusing on what the receiver -- the server did, rather,

11  is the BMC case.  I put quite a bit of information about

12  the BMC Vs. Paymentech, Federal Circuit case here.  But

13  the important thing that I would like to draw the

14  Court's attention to now is the actual claim language.

15            The Federal Circuit in this case concluded

16  that the claim was distributed or divided.  And if you

17  will look at the language indented to the far right,

18  prompting the caller to enter a payment number, that's

19  what a server does.  Prompting the caller to enter a

20  payment amount, again done by the server.  Accessing a

21  remote payment network associated with the entered

22  payment number, again the server does that.  But the

23  fourth element here is clear that the server does not do

24  that, the next step.  The accessed remote payment

25  network determining, during the session, whether

1  sufficient available credit or funds exist.  That is a

2  divided claim.

3          The rationale of the Federal Circuit, I

4  think, is particularly instructive here and leads

5  inextrably to the conclusion that the receiving the

6  image data is not a distributed claim.

7          The Court said, the concerns over a party

8  avoiding infringement by arms-length cooperation can

9  usually be offset by proper claim drafting.  A patentee

10  can usually structure a claim to capture infringement by

11  a single party.  And the Federal Circuit referenced this

12  article by Mark Lemley, Divided Infringement Claims, as

13  its support.  It went on to say in this case, for

14  example, BMC could have drafted its claims to focus on

15  one entity.  The steps of the claims might have featured

16  references to a single party's supplying or receiving

17  each element of the claimed process.

18          I looked at this article that the Federal

19  Circuit cited in support, and it is very instructive.

20  This article -- this is a quote directly out of the

21  article and what it says, obviously, is most inventions

22  that involve cooperation of multiple entities can be

23  covered using claims drafted in a unitary form simply by

24  focusing on one entity and whether it supplies or

25  receives any given element.  Compare, for example, two

1  different claims directed roughly to a method commonly

2  employed in electronic commerce...

3            So, here the author juxtaposed a divided

4  claim covering the same invention as a non-divided

5  claim.  And you will see under the first claim the

6  patent drafter stated, transmitting a request to a

7  server.  That's a third-party act, transmitting the

8  request to the server.  In response to the request,

9  supplying from the server a server certificate, that's

10 what the server does, and then (c), generating at the

11 client a unique client key and communicating the unique

12 client key to the server, and that's again at the client

13 computer.  And then (d), thereafter communicating

14 information, blah, blah, blah, the server does that.

15 So, the client does (a) and (c), the server does (b) and

16 (d).  That's divided.

17            A claim drafted to capture what the server

18 and what only the server does is an example of No. 2.

19 So instead of transmitting requests to the server,

20 receiving a request from a client, (b) is the same.  And

21 then (c), which is very similar to the claim in this

22 case, receiving from the client a unique client key

23 communicated using the server's public key.

24            The article concludes by stating that both

25 claims seek to cover the same invention, but the first

1  is distributed and the second is not because the first

2  requires that steps be performed by both the client and

3  the server, while the second, only the server is

4  performing any steps.

5            So it is clear that in this case the

6  receiving image data is what the server does, and then

7  the definition of what the image data is that's the

8  language onto which the Defendants are attempting to

9  graft the sending limitation.

10           The next argument that the Defendants make

11  is that as part of the bargaining with the patent

12  office, the patentees traded away the receiving part of

13  the claim and introduced the requirement that a third

14  party send the image data, which is simply not the case.

15  The Defendants stopped short of the part that I would

16  like to focus the Court on when they were quoting the

17  prosecution history in their brief.  It's lengthy, and I

18  apologize for that, but I put the whole thing in here so

19  the Court would have the entire context.

20           At the beginning of the prosecution excerpt

21  there, Wright teaches sending an identifier representing

22  the greeting card image to the server, to the central

23  server.  That the Wright was a prior art that the

24  patentees were distinguishing.

25           And then if you go down to the bottom of

1  that paragraph, the system of Wright teaches selecting a

2  greeting card image stored on a central image server,

3  prior art.  The present invention is directed to a

4  system where an image data is created by the sender and

5  not selected from preexisting -- from a preexisting list

6  of greeting card images.  Now, here is the part the

7  Defendants didn't quote.  Claim 1 and 2 have been

8  amended to clarify the point wherein the server receives

9  image data embodying the electronic image rather than

10 simply receiving image data that simply identifies a

11 preexisting image on a stored server.

12          The amendment was made to clarify that the

13 receiver -- that the type of image data that the

14 receiver -- that the server receives, and that is the

15 actual picture itself.

16          So, in short the receiving step should not

17 have grafted on to it or be redrafted through claim

18 construction to require a distribution between parties.

19 The drafters knew what they were doing and they focused

20 on the receiver, what it did, and what it received.

21          The next term I would like to address, Your

22 Honor, is storing, stored (sic) the received image data,

23 stored, stored image data.

24          Fotomedia's position is that no further

25 construction is required or copied or moved to a storage

1  medium.  And the Defendants would like to introduce the

2  limitation that the information be stored into a

3  database.

4              Well, looking at the claims themselves

5  there is no support in the claims for limiting each

6  instance of storage or storage -- stored data, or

7  storage device rather to a database.  In fact, the

8  claims -- 1 of the '774 and 1 and 2 of the '936 simply

9  say storing device or stored.  There is no limitation

10  that the data or information be stored in a database.

11  Claim 17, however, specifically addresses and does have

12  that limitation.

13              Looking at the -- on to the specification,

14  in the summary of the invention, storing again is not so

15  limited in a database.  It simply says storing.

16              And then even if you look beyond the

17  summary of the invention to the preferred embodiments,

18  the preferred embodiments show that when the patent uses

19  the term database, it uses it in a way that means

20  something no more than temporary storage.  For example,

21  in the '774, Column 4, line 67 through Column 5, line 6,

22  the patent states -- and I'm reading the underlined

23  language, Your Honor -- the temporary storage is called

24  the session database, 62.  So we see there that even in

25  the preferred embodiments, database refers only to

```
 1  temporary storage, not necessarily a database or a

 2  particular organization of data in storage.

 3              Another example where the patent is

 4  discussing the preferred embodiment, '774, Column 5,

 5  lines 19-23.  Graphical data, graphical (sic) images and

 6  photographs are stored in a file system of the server in

 7  a directory specifically created to store the temporary

 8  image files, herein designated as a temp image database.

 9              So, here are two examples where the

10  preferred embodiments used the term database, but it is

11  clear from the language that is nothing more than in the

12  first instance temporary storage or a file -- the file

13  system on the server in a directory specifically created

14  to store the temporary image files.

15              The last term that I would like to address

16  and then I will turn it over to my colleague, Mr.

17  Kitchen, is generate, display or generate a display, and

18  I will be brief here.

19              Generate, Fotomedia proposes simply the

20  plain and ordinary construction or create.  The

21  Defendants' claim construction imposes the additional

22  limitation of make a visual representation.  To begin

23  with, create is a verb, what is create is the object.

24  The Defendants have, with their proposed construction,

25  attempted to limit the verb generate to an object visual
```

1  representation of, and there's no support in the claims

2  and there is no support in the specification.  To the

3  contrary actually, the claims specify that other things

4  are generated.  Generating a message including an

5  identifier, generate a display including at least a

6  portion of the processed electronic image data.

7              Similarly the specification discloses that

8  things other than a visual representation are generated,

9  and there are six examples on Slide 33.

10             And the last point that I would make would

11  be this additional limitation that the Defendants seek

12  to impose which would be fixed, fixed image.  The

13  concept of fixed or the term fixed appears no where in

14  the claims.  Where it is used in the patent, it is used

15  in the '774, Column 6, lines 26-29 to address ways to

16  improve the efficiency of the system.  And there is the

17  quote, the use of static or generated images improves

18  the efficiency of the system by preventing the

19  recreation and transmission of images that are

20  essentially fixed during the operation of the system.

21             So Defendants attempt to limit display,

22  generate a display, to a fixed image should be rejected.

23             And one last point, Chris, if you could

24  bring up the '936 Claim 1, Column 14, 59-60.

25             A display is not necessarily limited to an

1    image.  The claim language itself evidences generate a

2    display including at least a portion of the processed

3    electronic image data.

4              THE COURT:  Well, do you dispute that the

5    display has to be something visual?

6              MR. MANLEY:  It has to be viewable.  In the

7    Defendants' brief they argue that it is visible -- that

8    it is, I believe, it's visible.  Matter of fact --

9              THE COURT:  Well, the word is display.

10             MR. MANLEY:  Display is -- let me get that

11   -- it's data that may be viewed.  And if by -- in their

12   brief on page 18 and 19, they argue that a display must

13   be visible, something visible, something that can be

14   seen, which on its face is just incorrect.  The data is

15   not seen until it is retrieved at the recipient

16   computer.  So, the display is something that is not

17   visible 24/7.  It is data that may be viewed and is

18   viewed when retrieved by the recipient computer.  But if

19   in arguing for these -- for their construction, the

20   Defendants are attempting to impose a limitation that

21   requires that something is visible, irrespective of

22   whether its been retrieved or not, that's simply

23   improper.

24             Chris, if you could go to Slide 35.

25             The reason as '936, Claim 1 made clear that

1 the display is available for viewing, it's not

2 necessarily visible at that time.  It is data that can

3 be viewed, it is not visible.

4             Thank you, Your Honor, I'll pass it to my

5 colleague, Mr. Kitchen.

6             THE COURT:  Okay.  Thank you, Mr. Manley.

7             MR. KITCHEN:  Good morning again, Your

8 Honor.

9             The next term we would like to deal with is

10 really a set of terms that have been briefed elsewhere

11 individually, associate a uniform resource locator with

12 a display.  Our contention is that no further

13 construction of that phrase is necessary.

14             Associate is dealt with as an individual

15 term.  The dispute there, both the Plaintiff and the

16 Defendant agree that associate means relate to.  The

17 degree of the relationship, whether it should be

18 specific and unique is at issue, and I'll deal with that

19 when I deal with the identifier term because it's the

20 same basic argument.

21             And the term display, as Mr. Manley points

22 out, is subject to dispute and the Court will construe

23 that term.  Defendants attempt to string this together

24 in an effort to impose an order of steps, and the

25 Court's obviously very familiar with the argumentation,

 1  and so I won't bore you with those issues.

 2          But essentially in the analysis, for

 3  example, in the Altiris case, when you begin looking at

 4  this issue, you will look at whether the claims

 5  themselves require such an order, whether the claims

 6  prohibit an association of a URL, and whether in an

 7  exemplary embodiment the specification suggests that

 8  it can be done in a different order.

 9          Now, in this particular claim -- and I will

10  deal with it more specifically later -- I'd just like to

11  draw the Court's attention to the fact that, one, this

12  associate term is just relating to.  In other words,

13  there is no indication anywhere in those two steps that

14  associating a uniform resource locator actually performs

15  any sort of operation upon the display.

16          Defendants latch on to the fact that a

17  display is generated in the previous step, and that a

18  URL is associated with a display.  And I'm going to go

19  through Your Honor's previous opinions with regard to

20  apparatus claims that have specific order, but that I

21  think -- I think the primary distinction will be

22  between those cases and this one that there is no

23  operation performed by the association step, it's merely

24  a relationship.  It's merely linking the URL to that

25  specific display, and that could be done when the

1  information is input from the user, that could be done

2  when the information is stored, that could be done when

3  the processing of the electronic image is done.  There

4  is no requirement, in other words, in the claim language

5  itself that the URL be associated after a display is

6  generated.

7              Defendants rely --

8              THE COURT:  Does the specification include

9  an example of associating a URL with a non-existent

10  display?  Such as for example, when you key in the

11  information.

12              MR. KITCHEN:  I believe it does, Your

13  Honor, to this extent, and I won't suggest to you that

14  it specifically says associating a URL, but the

15  specification does indicate circumstances, for example,

16  when the user first comes to the site, the initial web

17  page is a blank electronic postcard.  Essentially that

18  is a blank data structure, and at that point there is

19  nothing in the specification that indicates a URL could

20  not be related to that blank data structure.

21              THE COURT:  Well, am I trying to figure out

22  what the patentee invented or what he didn't invent?

23              MR. KITCHEN:  Well, I would only suggest to

24  you, Your Honor, that the relationship between the

25  preferred embodiment, the Defendants rely on, that is

1  the card key and the specific URL representation is too

2  limiting.  And what I'm, I guess, suggesting to the

3  Court is that there are situations described in the

4  specification where a URL may be associated.  Further,

5  the specification talks about regenerating the postcard,

6  and in that situation, if you think about it, when the

7  information, the session database changes, the server

8  regenerates the postcard and the new information appears

9  on the postcard.  This process can also be used to

10  change a field that has already been entered.  The card

11  is always displayed with all of the latest information

12  in the correct locations.

13              If it were the case that the URL had to be

14  assigned after the display was generated, then there

15  would have to be some reference in the specification to

16  associating a different URL.  And there is no

17  indication, no indication, that a different URL is

18  assigned when the display is regenerated.

19              I'm not sure that answers the Court's

20  question directly, but I think the point of the law is

21  with regard to this that unless there must an order to

22  the steps and the specification dictates that order or

23  the claims dictate that order, then it's not appropriate

24  to apply one.

25              And if I could just back up with the

1  Court's indulgence, and I know that this distinction is

2  one the Court has in some circumstances agreed with and

3  in others not agreed with, in Combined Systems which is

4  the case that the Defendants cite, they are dealing with

5  a method claim and this is obviously an apparatus claim.

6  And while the Court has and the Federal Circuit has --

7              THE COURT:  It's a software system though,

8  right?

9              MR. KITCHEN:  Pardon me?

10             THE COURT:  It's a software implementation

11 though, right?

12             MR. KITCHEN:  Correct.  Has, in fact, said

13 that there are circumstances where it's appropriate to

14 apply an order in an apparatus claim, it must take --

15 the specific language is that it must take place in a --

16 the steps or processes that must take place in a

17 particular order.  And I don't believe that's the case

18 here in this apparatus claim.  And as the Court

19 rightfully pointed out as recently as two weeks ago in

20 Versata Vs. SAP, there is a two-part test that deals

21 with that issue.  We look to the claim language first,

22 and then we look to the rest of the specification.

23             THE COURT:  Well, the record will reflect

24 that you've characterized that opinion as rightfully

25 recognizing something.

 1                    (Laughter.)

 2                    THE COURT:  I'm being facetious, Mr.

 3    Kitchen.

 4                    MR. KITCHEN:  I appreciate that, Your

 5    Honor.

 6                    Rightfully recognized the test, not

 7    necessarily the application of it.  Although I dare not

 8    question that at this point.

 9                    And I think two other things are important

10    --

11                    THE COURT:  You can question it, I'm just

12    not sure this is the appropriate forum for doing it.

13                    MR. KITCHEN:  I agree with you, Your Honor.

14                    The notion that the or said, and that is

15    really what the Defendants are arguing here is that the

16    display relates back to the previous step, and that in

17    and of itself creates the ordering, has been rejected by

18    Respironics, and that was, of course, based on

19    Interactive Gift, and Interactive Gift, I think, is

20    going to be the determinative case here.  It says there

21    is no reason why step one is providing of information to

22    the IMM must occur before step four is receiving the

23    request reproduction code.  In other words, I believe,

24    the law says that it's not required that we provide

25    entire specification support.  But they've got to

1  provide evidence and argumentation that suggests it must

2  be done.

3           Now, in the Court's Versata/SAP opinion,

4  for example, where the Court used that analysis on an

5  apparatus claim, I think that the claims were distinctly

6  different.  If you look at what was done, for example,

7  in Oak Tech, which is the Federal Circuit case the Court

8  cited to in Versata, you've got specific error

9  corrections circuitry and there are interactions between

10 that circuitry.  The error correction circuitry must

11 perform error correction.  The cyclic redundancy checker

12 must detect errors, it must ultimately provide corrected

13 data.  These required interactions support the

14 Commission's observation, the court says.

15          Furthermore, when they look at the claim

16 language regarding assembled data.  It's processed by

17 the error correction circuitry and converted into

18 corrected assembled data.  That second step is acting

19 upon the output from the previous step and manipulating

20 it in some fashion.  Comparing it, storing it,

21 processing it, et cetera.

22          The same is true in the other case that the

23 Court cited in Versata, Visto Vs. Good.  And the Court,

24 I'm sure, will recall that the -- Claim 22 of the '192

25 patent required generating first examination results,

1 generating second examination results.  The Court

2 ultimately ordered it as initiating steps (a) and (b)

3 first from within the firewall and then generating a

4 preferred version from the first workspace element from

5 the copy based on the first and second examination

6 results, which involved a comparison of those two

7 results.

8          The distinguishing factor in this case --

9 well, let me just clear Versata first, if you don't

10 mind.  In Versata you had a situation where you had to

11 retrieve data because you were going to perform an

12 operation on it, and that was to sort it.

13          In the instant case all we're doing is

14 associating, relating a URL.  We're just making a

15 linkage.  The uniform resource locator does not make any

16 comparisons, it does not process in any way, it doesn't

17 impose any manipulation whatsoever on that previous

18 step.  And I think that distinguishes these claims from

19 the claims in Oak Tech, Visto and Versata.  In this

20 particular situation, since there is no processing going

21 on of the previous display in the next step, there is no

22 justification, there is no must-read as the law

23 requires.

24          I think the claim relationship is more akin

25 to Interactive Gift.  And the Court may recall that in

1   Interactive Gift in the Freeny patent, each information

2   -- in the first step it required that each information

3   being uniquely identified by a catalog code.  And in the

4   last step, reproducing in a material object the

5   information identified by the catalog code.  And the

6   defendants argued in Interactive Gift that step one had

7   to occur before step four, but the court said, no,

8   that's not the case.  And this is a very similar

9   situation, we're just creating an identification with a

10  URL.  We're just relating the URL.  And there's no

11  reason why that can't be done at another step in the

12  claim because there is no operation performed by that

13  step.

14              Now, the Defendant seeks to impart the idea

15  that this URL must be included because the URL cannot be

16  created before the display is generated because the URL

17  includes a card key that is created after the user is

18  finished composing the display and clicks send.

19              A, that's clearly importation of a

20  preferred embodiment, just the postcard.  There are

21  variations in the patent of various manipulations that

22  can be done which would take us out of this context.

23  So, it's inappropriate to import this limitation on the

24  specific claim.  The idea that a card key is created is

25  specifically the preferred embodiment.

1          And secondly, the card key in and of itself

2    is just a portion of the URL.  It's just the last

3    portion of the URL that directs the URL to that html

4    page that has one or more displays on it.

5          And so, in this particular context it's not

6    sufficient for the Defendant to take a limitation of the

7    preferred embodiment and say, the steps must occur in

8    this particular order.

9          And as I pointed out to the Court, there is

10   other places in the specification where that association

11   could take place.  And it's not necessary that the

12   inventor provide every potential embodiment in its

13   description of the invention.  And this regeneration

14   effect, I believe, as well creates a situation where by

15   necessity the URL may have already been assigned and the

16   user is customizing by going back to that URL and

17   essentially regenerating the postcard, and the new

18   information appears on the postcard --

19          THE COURT:  Would the new postcard have a

20   different card key associated with it?

21          MR. KITCHEN:  I don't believe so, Your

22   Honor.

23          THE COURT:  Okay.

24          MR. KITCHEN:  It would have the same URL.

25   I believe all the card key is is the last portion beyond

1  the last forward slash of the URL.

2              Any other questions, Your Honor?

3              THE COURT:  No.

4              MR. KITCHEN:  Okay.  The next term is the

5  digital image.

6              And I need Mr. Manley's stop watch here --

7              MR. MANLEY:  It's right there on the --

8              MR. KITCHEN:  Ahh, thank you.

9              The dispute here, digital image and image

10 data, without the definitive article the, are agreed

11 terms.  The parties have agreed they have their plain

12 and ordinary meaning.  The issue is whether or not when

13 that definitive article the is imposed, does it change

14 the meaning of the term?  And just for the Court's

15 reference, in 4-5(d), the Defendants presented two

16 different definitions.  One for the digital image, one

17 for image data.  They are not significantly different,

18 and in their final briefing where it says new there,

19 they use one definition for both.  And so, my arguments

20 are addressed to that, I don't think it makes any real

21 difference, but for the Court's reference, the

22 Defendants' briefing indicates -- and I believe that's

23 the live pleading, the uploaded unprocessed image data.

24              And essentially what the Defendants are

25 trying to do is import two terms, uploaded and

1  unprocessed.  Now, in the preferred embodiment the

2  intrinsic references include image data that is clearly,

3  clearly not uploaded.  For example, at Column 10 -- in

4  the '936 at Column 10, line 67 through Column 11, line

5  2, it states:  In the photo file operation 351, the user

6  specifies a file on the local client computer that holds

7  the image data he or she wants to use on their card.

8  That is a file that is not uploaded, that's still in the

9  client computer.  So there is support in the

10  specification for the idea of data that is both uploaded

11  and not uploaded.

12           The plain language of the claims indicates

13  that the digital image existed prior to the uploading.

14  Now the '936 states:  Allowing a user of the client

15  computer to upload to the server a digital image,

16  contact information, and an e-mail address of a

17  recipient implies, implies that there is image

18  information that is not yet uploaded because the client

19  -- the user is allowed to use the client computer to

20  make the upload.  And that's at Column 15, lines 28-31.

21           Later references to the digital image refer

22  back to that same initially recited digital image, and

23  therefore cannot be limited to image data that is

24  uploaded only.  For example, there is a reference to

25  storing by the server, the digital image and the content

1  information.  That is clearly information that is

2  uploaded in certain circumstances and in the previous

3  statement, information that comes from the client

4  computer, comes from the user and is uploaded.  So, the

5  digital image -- the digital image itself remains the

6  same, but it is in a different state when it is

7  uploaded, and it's also in a different state when it is

8  processed.

9              And there is justification of the law for

10  having that differentiation between the definitions of

11  the claim.  Under Paragon, for example, Paragon

12  Solutions Vs. Timex, 2009 U.S. Lexis 10884, the Federal

13  Circuit has stated:  We apply a presumption that the

14  same terms appearing in different portions of the claims

15  should be given the same meaning.  And that is the

16  citation the Defendants use in their briefing.  But this

17  latter portion says something different:  Unless it is

18  clear from the spec and the prosecution history that the

19  terms have different meanings at different portions of

20  the claim.

21              And our contention is that a digital image,

22  when it's uploaded, has a bit of a different meaning

23  than it does when it's not uploaded.  And it can have

24  those two different meanings.

25              Similarly with regard to processing.  That

1 particular term was defined in the patent by the

2 inventor in '936 at Column 3, lines 4-11.  Most

3 importantly I will direct the Court's attention to the

4 terms formatting and storing are included within the

5 idea of processing.

6           Now, Defendants want to limit this term

7 image data to only unprocessed image data, but nothing

8 in the spec or in the claims forbids any processing or

9 requires any processing.  In point of fact, the

10 preferred embodiments are replete with examples of both.

11           For example, Column 11, lines 28-30 of the

12 '936, when a photograph is received on the server, the

13 electronic postcard server software processes the photo

14 using several steps as illustrated in Figure 3a.

15           Well, in the first place, this implies that

16 the photograph was at one point not uploaded.  Once it

17 is uploaded, then it can be processed.  And this

18 indicates that the Defendants' idea that the digital

19 image must be unprocessed is inappropriate and

20 inconsistent with the specification and reads in an

21 inappropriate limitation.

22           Similarly at Column 11, 31-38, the image

23 data that is posted to the server must be in a size and

24 format that the electronic postcard software can handle.

25 The first step is to check the byte count of the data,

1    et cetera.  Next the image data is saved as a temporary

2    file and the type of the file is checked.  Again, the

3    image data is processed according to the inventor's own

4    definition, which is to store, which includes to store.

5    And that specific reference to check the image next, the

6    image data is saved falls within that definition of

7    processes.  So, this is a usage of that particular

8    language within a specification that indicates it is

9    processed, not unprocessed as the Defendants would have

10   one believe.  Again, and checking the byte count of the

11   data refers to formatting and that is also part of the

12   definition of process that the inventor included.

13              THE COURT:  Mr. Kitchen, let me ask you

14   about Claim 1 of the '936 patent.

15              MR. KITCHEN:  Yes, Your Honor.

16              THE COURT:  One of the claim limitations

17   includes the language the CPU adapted by a program to

18   store the user information in the storage device, and

19   then next limitation is process the electronic image

20   data.

21              User information, as I understand it,

22   includes both the electronic image data or at a minimum

23   the electronic image data and at least one e-mail

24   address of a recipient.

25              MR. KITCHEN:  I believe that is correct,

1   Your Honor.

2                   THE COURT:  If you have stored the user

3   information as required by that next limitation there --

4                   MR. KITCHEN:  Correct.

5                   THE COURT:  -- in the storage device, is

6   your argument that you have at that point satisfied the

7   next limitation, processed the electronic image data?

8                   MR. KITCHEN:  No, Your Honor, it is not.

9   And I'm not sure I'm certain where Your Honor is driving

10  here, but --

11                  THE COURT:  Well, if your definition of

12  process includes storing?

13                  MR. KITCHEN:  Well, that may not be the

14  only process that is applied to the image data, there

15  may be other processes that are included.

16                  THE COURT:  In a situation where there is

17  no other processing that is done, is it your position

18  that by storing the user information in the storage

19  device that the CPU has then processed the electronic

20  image data?

21                  MR. KITCHEN:  That would seem to fit within

22  the definition that the inventor has included within the

23  patent, sir, yes.

24                  THE COURT:  Okay.  I understand your

25  position.  So your view then is that -- I understand

1 what the specification says is meant by processing.

2     MR. KITCHEN:  Yes, sir.

3     THE COURT:  But then in that instance

4 storing and processing would just be redundant in the

5 claim?

6     MR. KITCHEN:  Well, it says store the user

7 information, but it might not include all of the

8 electronic image data.  In other words, the step reads

9 store the user information in the storage device, user

10 information would include electronic image data and at

11 least one e-mail address.  It doesn't say it would

12 include all electronic image data.  So, it is possible

13 that, in fact, I guess the reference back to the

14 electronic image data might be interpreted that way, but

15 I don't believe it satisfies that next step.

16     THE COURT:  Okay.

17     MR. KITCHEN:  I will have to give that some

18 thought, Your Honor, as well.

19     Finally, identifier, information for

20 identifying image data.  The only issue here is whether

21 it's uniquely identifying particular image data, and the

22 issue is whether or not the identifier must uniquely

23 identify image data.

24     And in the Defendants' briefing it is not

25 entirely clear to me whether their position is that it

1  must be a single image.  It appears from their

2  definition that it might not be, however when one reads

3  the briefing closely, one finds that this notion of

4  identifier -- and I'm quoting from page 13 of the brief

5  -- the identifier exists to serve only one purpose, to

6  identify a particular image and thereby enable access to

7  that specific image.  If the identifier did not uniquely

8  identify a particular image, it would not be able to

9  perform its stated purpose, only the Defendants'

10  construction correctly aligns the identifier with this

11  purpose.

12          And it is simply not the case that the spec

13  provides that the identifier be associated with a single

14  image.  In several places the specification supports the

15  idea that one or more displays may be assigned to a

16  unique identifier.  The person receiving the unique

17  identifier can retrieve the one or more displays

18  represented by the identifier from the server for

19  viewing.

20          Furthermore in this second sentence here in

21  Column 5, as an alternate embodiment, the temporary

22  graphical data files may be retained for additional

23  usage such as creation of an album of images.  And so

24  there is a multiplicity of purposes of displays or

25  images associated with a given identifier in the

1  specification.  And they are simply trying to read it

2  out, and the way they are trying to read it out, I think

3  and I've put this definition up here just so that's it's

4  easier to explain, is they have taken this term unique

5  and essentially used one part of -- one possible

6  definition of the term unique and implied it, and that

7  is being the sole or only.  They are trying to suggest

8  that because it says a unique identifier that it is only

9  related to one specific image.  That is not the case.

10            The word unique in this context means being

11 without a like, more like discreet.  It is one

12 identifier for a set of displays or a set of images,

13 another identifier for another set of displays or

14 images.

15            And I don't think that there is any

16 justification for that in the construction for

17 restricting it to an image in the construction.

18            THE COURT:  Does there have to be some type

19 of relationship between the sets of images that are

20 identified under your definition of unique?

21            MR. KITCHEN:  The sets of images would be

22 tied to one identifier, yes, Your Honor.

23            THE COURT:  Well, but some other

24 relationship beyond that?  An album, that type of --

25            MR. KITCHEN:  It could be an album, and

1  there is variance, but it doesn't necessarily have to be

2  those.  It could just be a set of images or set of

3  displays that a particular user has decided to associate

4  with a particular URL, and when he provides that to the

5  recipient, the recipient gets the URL, clicks on it and

6  gets this variety of images or displays.

7              Does that answer your question?

8              THE COURT:  Yes.

9              MR. KITCHEN:  Now one thing I should say is

10 Defendant appears to rely again on this card key

11 analysis, and I promised that I would go back to this

12 idea of association.  The same analysis applies to the

13 Defendants' definition of associate when they are

14 attempting to create a unique and specific association.

15 There is just nothing in the specification that supports

16 that, and the same parts of the specification that I

17 have cited to you indicating that the identifier can be

18 associated with one or more displays certainly supports

19 our construction that it is related to one or more

20 displays.

21              Again, they cite back to this idea of a

22 card key that uniquely specifies that particular

23 electronic postcard, that is clearly a preferred

24 embodiment, and not the only invention that is described

25 in the '936.  And to read that card key analysis in

1 reference to a particular electronic postcard into the

2 entire claims would be to import a limitation

3 inappropriately.

4          If the Court has nothing further, I will

5 turn it over to Mr. Shumaker.

6          MR. MANLEY:  I just want to -- John, can I

7 have a minute of your time?

8          Judge, may I?

9          I have been sitting here reflecting on our

10 conversation about the server term and the enablement,

11 and I don't think I responded to your question the way I

12 intended to, and so I would like to straighten it out.

13          I believe you asked me whether the

14 distributive system of servers were enabled.  The answer

15 to that question is yes, they are by the patent.  What I

16 intended to convey to the Court by my earlier answer and

17 conversation about the enablement requirement is that I

18 don't believe the patent goes into pages and pages of

19 how servers would work in tandem, nor do I think that

20 was -- is required in order to enable multiple servers

21 or a distributive system because it would not require

22 undue experimentation by an artisan skilled in the art

23 to implement multiple servers or a server system as set

24 forth in the specification or a distributive system.

25          That's what I intended to say, and I wanted

1    to make sure I got that clear on the record.

2              Thank you, Your Honor.

3              MR. SHUMAKER:  Good morning, Your Honor.

4              First I would like to address one more term

5    from the previous patent we've been discussing, and

6    that's the term computer-related terms.

7              There is one issue associated with various

8    terms and that's, should a computer be construed as a

9    personal computer or not.  Fotomedia says no; Defendants

10   say yes.

11             One argument that I want to point out that

12   I think is telling.  If you look at the preferred

13   embodiment of the invention, the preferred embodiment is

14   not limited to a personal computer.  The preferred

15   embodiment discusses a personal computer, but it also

16   identifies any other computer capable of running a

17   standard web browser.  So not only did the Defendants

18   import a limitation from the preferred embodiment in its

19   -- this construction, their construction is actually

20   more narrow than a preferred embodiment and simply must

21   be rejected.

22             Furthermore, there is no support in the

23   claim language or the prosecution -- claim language or

24   the specification for Defendants' construction of

25   personal computer.

 1          Now I want to jump to the '231 patent.  The

 2   first term I want to discuss is roles.  What is the

 3   construction of a role?  Before --

 4          THE COURT:  Why shouldn't I adopt the

 5   definition that is provided in the article that both

 6   sides seem to agree is written by someone who knows what

 7   he's talking about in this article?

 8          MR. SHUMAKER:  I think that's a very good

 9   starting point for the construction.  A couple of

10   issues.  One, the critical issue is that for a role to

11   exist, a role need not be assigned to a user.  A role is

12   simply a designation to which access privileges can be

13   assigned and also to which users can be assigned.  So,

14   if it's clear that a role is not necessarily assigned to

15   a user or even an access privilege, yes, then I think

16   Fotomedia would be agreeable to the construction.

17          The disagreement Fotomedia has with the

18   Defendants' current construction is that its use of the

19   term intermediary designation.  Fotomedia would be fine

20   with either intermediary or designation, but the phrase

21   intermediary designation itself is vague and ambiguous.

22   It's just simply unclear what that term means.

23          Let me jump to the next term, associating

24   users who access the images with the roles.

25          There are a couple of issues that Fotomedia

1  has with this term.  First and foremost is that

2  assigning a list to a user is not disclosed in the

3  specification.  There is clearly no intrinsic evidence

4  for assigning a list of users to roles.  That part of

5  the Defendants' construction is clearly improper.

6             The other aspects of this term is

7  essentially the term needs no construction, no further

8  construction.  The term is associating users who will

9  access the image with the roles.

10             What does the claim language say?  If you

11 at look at it, essentially you are associating users who

12 access the images with roles.  So, Fotomedia's position

13 is that that phrase requires no further construction

14 beyond the definition or construction of roles.

15             The Defendants, on the other hand, want to

16 impose not only the limitation of assigning a list of

17 users, which is clearly unsupported in the

18 specification, but also the limitation for at least two

19 roles, which again, is unsupported.  I mean, it is part

20 of the specification, but it is importing limitations

21 from the specification into the claim language.

22             THE COURT:  Why didn't the patentee draft

23 the claim language -- if you can go back to that slide.

24             (Complies.)

25             MR. SHUMAKER:  This slide?

1              THE COURT:  Yes.  Why wouldn't he have

2   drafted the claim language with associating a user who

3   will access the image with a role?

4              MR. SHUMAKER:  As opposed to associating

5   users?

6              THE COURT:  The pleural of both.

7              MR. SHUMAKER:  Sure.  Mainly to enable --

8   allow for the possibility that there is going to be more

9   than one user that accesses a system.  It makes no sense

10  to have a single user or a single owner.

11             THE COURT:  Well, if a means one or more.

12             MR. SHUMAKER:  Yes.

13             THE COURT:  If the patentee knew that rule,

14  why wouldn't this patentee also have known that rule?

15             MR. SHUMAKER:  They certainly could have

16  drafted it as associating a user who will access the

17  image with a role, absolutely.  I see no problem with

18  that, but the question is, well, why didn't they do

19  that?  I think if you look at the phrase associating

20  users who will access the image with the roles, the

21  question is, well, the term users, when it's plural,

22  does that necessarily mean there has to be at least two

23  users?  I think the answer to that answer (sic) is yes,

24  there has to be at least two users, that's probably why

25  there was an "s" associated with it.

1            Now, the question is when you associate

2    users with roles, are you associating the same role to

3    those two users or are you associating different roles

4    to those two users?  So, when you start incorporating

5    associating users who will access the image with a role,

6    does that imply that that same role is associated to the

7    users or not?  I think that would be ambiguous.  Now, if

8    you leave it in the possessive form, roles, the role

9    could be -- the roles possessive could incorporate

10   either the same role associated to two users, so you

11   have in total two roles, but it's the same role, or it

12   could be two different roles.  I think this language

13   allows a possibility that a separate -- a single role

14   could be associated with two users or two different

15   roles could be associated with two users.  The critical

16   issue is are there -- is there more than one role and is

17   there more one user in the system.

18            But I grant you, is the language perfect?

19   By no means, it's not perfect.  That's why we're here.

20            Another issue with the Defendants'

21   construction, one, they are trying to equate assigning

22   with associating.  The claim language uses associating,

23   not assigning.  Furthermore, Claim 2 of the '231 patent

24   actually uses the term assigning, and therefore

25   Fotomedia knew when they wanted to assign a role, that

1  that would be different than associating or that would

2  not necessarily be coterminous with associate.

3              And as I mentioned before, there is just

4  simply no support in the specification for assigning a

5  list of users to roles.

6              THE COURT:  The plurality of users?

7              MR. SHUMAKER:  Correct.

8              The next term, associating the roles with

9  individual metadata elements.

10             THE COURT:  Excuse me just a second.  I

11 promised you I would warn you when you had used an hour.

12 You have used an hour and two minutes.

13             MR. SHUMAKER:  Thank you, Your Honor.

14             So what are the issues with this term?

15 One, again Fotomedia believes there is no further

16 construction necessary.  Two, the specification is clear

17 that roles may be assigned to groups of metadata

18 elements and not simply an individual metadata element

19 as discussed in the Defendants' brief.  And three,

20 again, assigning a list of roles to metadata elements is

21 simply part of the preferred embodiment and is not

22 required.

23             In the interest of time, let me just jump

24 to the specification, and when the specification

25 discusses the invention, it discusses the invention in

1  context of roles and privileges associated with it, but

2  then it also uses an alternate embodiment.  So the

3  argument that the term present invention somehow limits

4  the construction of this term to a list, is simply not

5  supported by the specification.  The specification is

6  clear that the present invention is not a limiting term

7  whenever you read the present invention in context with

8  the language in the summary of the invention.

9          Secondly, I think it's worthwhile pointing

10  out that list is not required because if you look at the

11  claim language, there are dependent claims which

12  introduce the concept of associating a list with each

13  metadata element, thereby suggesting that a list of

14  metadata elements or a list of roles associating with

15  those metadata elements is not to be imported into the

16  construction of the term as found in the -- as found in

17  the independent claim.

18          Here we go, let me make sure I'm on the

19  right term here.  Sorry, Your Honor, I skipped my slides

20  too fast here.

21          Okay.  One more issue I want to point out

22  on this term.  It's the Defendants rely upon an excerpt

23  from the prosecution history.  And based on the

24  prosecution history, the Defendants argue that Fotomedia

25  disclaimed the use of somehow accessing metadata along

1  with the image.  But interestingly -- I'm sorry, one

2  more time, that's actually in a different term.

3           In this aspect what the Defendants are

4  pointing to is the prosecution history which somehow

5  supports assigning roles to individual metadata

6  elements.  And what I'd like to point out is that the

7  prosecution history doesn't relate to assigning roles to

8  individual metadata elements, what it relates to is the

9  fact that the prior art reference that was in front of

10  the examiner did not involve the use of an image with

11  associated metadata.  It simply involved the use of an

12  image or image file stats, and therefore making the

13  argument that Fotomedia somehow disclaimed the use of

14  associating the roles to individual metadata elements

15  based on the prosecution history is simply a misread of

16  the prosecution history.

17           THE COURT:  Do you have a problem with that

18  definition of metadata?

19           MR. SHUMAKER:  No, Your Honor, we don't.

20  In terms of data that describes other data?

21           THE COURT:  Or data about data?  Which is

22  what -- as I read the applicant's statement it says,

23  that that's the common -- what -- he's distinguishing

24  prior art on the grounds that the prior art did not

25  concern metadata which is commonly defined as that.

1          MR. SHUMAKER:  As data about data.

2    Correct.  And, I mean, in that situation, I mean,

3    Fotomedia, I believe, would be okay with that

4    construction.  Certainly we would like data about or

5    relating to the image.

6          THE COURT:  Well --

7          MR. SHUMAKER:  Or associated to the image.

8          THE COURT:  -- that's not what your

9    patentee said.  I mean, it could be a lot of data that's

10   related to other data, but that isn't metadata, is it?

11         MR. SHUMAKER:  No, that's true.  But in

12   terms of -- you're absolutely right, in terms of the

13   prosecution history, clearly the patentee defined or at

14   least suggested a definition for metadata as data that

15   describes other data or data about data.

16         So, yes, Your Honor, in answer to your

17   question, Fotomedia would be acceptable to the

18   construction of metadata based upon the prosecution

19   history.

20         The next term is request for access to the

21   metadata.  The simple issue is is the request a request

22   for only metadata or can the request be a request for

23   the image and the metadata?

24         Well, the specification and intrinsic

25   evidence is fairly clear.  The intrinsic evidence states

1  that the request can be a request for the image and the

2  metadata.  Put up a section from the '231 patent, Column

3  4, and it states, highlighted, the user's request to

4  access the image and its metadata, which is a clear

5  support that the request can be a request for the image

6  and the metadata.  And under the Defendants'

7  construction they would exclude that preferred

8  embodiment, which under law is rarely if ever correct.

9              THE COURT:  Well, do other claims

10 specifically capture the concept of requesting both the

11 image as well as the metadata?

12             MR. SHUMAKER:  Do other claims?  Well, the

13 Defendants -- maybe -- I hope this addresses your

14 question.  Let me make sure.  So, if you look at --

15             THE COURT:  Such that the preferred

16 embodiment is actually claimed, is my question.

17             MR. SHUMAKER:  Oh, is the preferred

18 embodiment claimed as one of the independent claims, but

19 not claimed in all of the other independent claims, is

20 that what --

21             THE COURT:  Or any of the dependent claims?

22             MR. SHUMAKER:  I think the answer to that

23 question -- I mean, first of all, we would have to look

24 at the claim language.  So, if we look at the

25 independent claims, let's look at Claim 25.  Claim 25

1  talks about assigning roles versus associating roles.

2  And associating roles versus assigning roles would be

3  two different concepts, and -- I'm sorry, let me back up

4  because your question went to a different issue than

5  what I was going to talk about.

6            So, does this specification -- does the

7  claims claim a request for accessing the image and its

8  metadata?  I would argue that no, it doesn't, because if

9  you look at the claims that are identified in the

10  Defendants' brief, they actually refer to claims that

11  differ in aspects lower than or beyond simply the

12  request as a request for the image, the request as a

13  request for the image and a metadata or the request as a

14  request for the metadata.  And I don't see any support

15  where there is a straight claim differentiation argument

16  that the request in one of the independent claims was

17  merely a request for the metadata and nothing else.

18            And I would also mention that claim

19  differentiation is a presumption which can be rebutted

20  based upon the intrinsic record, and I put forth that

21  the intrinsic record provides no support for claiming in

22  one of the independent claims that the request is a

23  request for only the metadata.  But there are certainly

24  other claims that claim requests for the image and are

25  requests for image and metadata, but that's not the only

1  difference between those claims.

2            The next term I would like to go into is a

3  user's role is determined from the request.  The main

4  issue in this term is what information is used to

5  determine the role?  From the Defendants' standpoint the

6  information must include or must be taken from the set,

7  that would be the user ID, class ID, group ID or

8  information about the access type.

9            Fotomedia argues that that's merely an

10 importation of the preferred embodiment into the claim

11 language in that the user's role can be determined from

12 information related to the request, but is not

13 necessarily limited to the specific types of information

14 identified in the Defendants' construction.

15            And that's the end of my presentation.

16            MR. KITCHEN:  Thirty seconds of

17 clarification, Your Honor.

18            One is with regard to the question you

19 asked me regarding a card key, and I believe I

20 misunderstood the question.  It is clearly the case that

21 in that example the card key uniquely identifies that

22 particular electronic postcard.

23            THE COURT:  It's part of the URL, correct?

24 So, there would be a different URL created for modified

25 or regenerated postcards where the information had

1    changed, correct?

2                    MR. KITCHEN:  Correct, but that is just one

3    example.  And as the Defendants point out in Footnote 18

4    of their responsive briefing, specifically this idea of

5    a card key as an identifier to a postcard is just one

6    example that is in the patent.

7                    Secondly, with regard to the claim language

8    and whether storing satisfies process, I think the

9    position that is correct, Your Honor, and it's

10   consistent with the slide I showed you from the

11   preferred embodiment where we talked about the image

12   data, and the first step was to check the byte count of

13   the data, and the second step was the image data is

14   saved, and I referenced one as format and one as

15   storing.  Our definition of process then would include

16   both a manipulation and a storage feature.  And I think

17   that's consistent with the way the inventor has defined

18   the term.  It includes both manipulation, formatting,

19   various types of formatting and storage.

20                    Thank you.

21                    We will retain the rest of our time,

22   please.

23                    THE COURT:  You have used an hour and 13

24   minutes.

25                    MR. KITCHEN:  Thank you, Your Honor.

1          MR. CHATTERJEE:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. CHATTERJEE:  My name is Neel Chatterjee

4  and I represent Photobucket in this case.

5          I thought I would start by giving a very

6  short agenda about kind of what we're going to try and

7  cover today.  Given the amount of time that we have,

8  we're going to focus on a couple of the key terms that

9  we think the Court might benefit from argument.  We do

10 -- we are prepared to talk about the other terms, should

11 Your Honor desire that, although we thought focusing

12 this would be helpful.

13         And because there are a lot of parties here

14 with a lot of different stakeholders, we've divided the

15 responsibilities.  For the '774 and '936 patents, I'm

16 going to talk a little bit about the background of those

17 patents and a little bit about what the patents are all

18 about, and I will also discuss the server term, which

19 Your Honor had a lot of questions about, and the

20 associate term.

21         Mr. Partridge, who represents Yahoo, will

22 talk about the receiving image limitation, generate a

23 display, and the digital image.

24         And then Mr. Dunham, who represents some of

25 the cell phone carriers in the other case that is

1  consolidated for Markman, will talk about the term

2  computer.

3          We'll then proceed to the '231 patent and

4  my colleague, Gabe Ramsey, will give similar background

5  on the invention and talk about the roles and

6  associating roles and metadata elements terms.

7          And then Mr. Sacksteder, who represents

8  Shutterfly, will discuss the means-plus-function

9  limitations, and particularly the indefiniteness issue

10 under the Artisan case that has been fairly thoroughly

11 briefed by the parties.

12         So, I know that we have to break at 10:30,

13 Your Honor, and I'm going to spend about --

14         THE COURT:  10:25, we're going to take a

15 break in five minutes, but I want to go ahead and let

16 you start your argument.

17         MR. CHATTERJEE:  Absolutely, and Your

18 Honor, just feel free to tell me when to stop.  I'm

19 going to spend about 20 minutes talking about my terms

20 and the background total.

21         So, let's start with the background.

22         In our briefing the parties didn't really

23 say what one of ordinary skill in the art was in the

24 papers, and I noticed that as we were preparing for the

25 hearing.  Our briefs were prepared from the following

1  perspective:  That a person of ordinary skill in the art

2  for the '774 and '936 patents were a person with a

3  bachelor's degree in computer science, computer

4  engineering or the equivalent, and one to two years of

5  experience in developing client/server applications or

6  services for the Internet.

7         And that's the perspective from which we're

8  presenting our argument and that was presenting in the

9  briefs.

10        Now, the '774 and '936 patents which we

11 ironically refer to as the Mayle patents, but it's

12 M-A-Y-L-E, really is talking about an electronic

13 postcard.  And in the presentations, one of the things

14 that I think is really a good governing example of what

15 they're really getting at when they talk about the

16 patent is what is shown in Figure 14 of the '774 patent.

17        And we actually see a document that looks

18 like a postcard.  It has a picture on the front which

19 some handwritten text.  It has written commentary on the

20 other side, a spot for a stamp and an address.  And then

21 there is a vehicle to input the actual address to send

22 it.  It actually looks like a physical postcard that one

23 might receive from a loved one that's gone on vacation.

24 The primary difference being is you need to have an

25 internet architecture to implement that.

1          Now, postcards, if you really think about

2 it and abstract it, have certain key attributes that

3 really find themselves in various ways in the patents.

4 The first thing about them is they are personalized,

5 they have a specific recipient in mind or a specific set

6 of recipients in mind.

7          The second is that they are unique.  I

8 might send something different to my best friend from

9 college than I might to my grandmother.

10          They have text and images.  One side will

11 typically have a picture or maybe even a series of

12 pictures on it, and then on the other side there will be

13 text, things that I have written.

14          And the final thing is that they have a

15 defined structure as you can see from Figure 14.

16          Now, this concept of the electronic

17 postcard is repeatedly referred to as the invention in

18 the patent, and it really is a driving consideration

19 throughout the patent, that implementation of these

20 attributes is really what the patent is getting at.

21          Just a few examples, although this happens

22 repeatedly throughout the patent, is they talk about the

23 figures.  Now, when you look at the figures, they

24 repeatedly use the cadence the present invention

25 electronic postcard, or the flow charts of the steps

1  executed by a personal computer of the present invention

2  in creating the front and back of an electronic

3  postcard.  And if you really look at what the

4  architecture is about, it's about the specialized way to

5  make sure you can send a personalized unique set of text

6  and messages from one person to another.

7          Now the way that they did this on the

8  patent was they implemented what's shown in Figure 2.

9  There is a personal computer operating system and then

10 there's a server computer operating system across the

11 network.  And this picture is actually one of the

12 central attributes when you look at the claims that are

13 in dispute, particularly the server computer operating

14 system picture or part of the figure, number 31.

15         On one side you have a browser, something

16 that lets you access the web.  You have a file system

17 where the photo file is stored, and you have a mail

18 reader, that might be something like a Microsoft Outlook

19 program.

20         On the other side you have the web server

21 software, that's the software that lets you communicate

22 with the personal computer.  The mail server software,

23 that's the software that will send out e-mail messages,

24 the session database and the temporary image database.

25         Now, this is a very, very important

1  attribute in the concept of what the Plaintiffs'

2  argument is.  What those two things do is they manage a

3  particular discussion going on between a personal

4  computer and a server computer at a given moment in

5  time.  That is not really what the patent is talking

6  about when you look at the overall system architecture.

7  That's talking about when I access the web, and I go to

8  www.google.com, a session is created, and for that time

9  when I'm working on Google, there is a series of

10 communications that occur.  But when the session ends,

11 that temporary image database, in the words of the

12 patent, and the session database are essentially no

13 longer useful and they would have to create a new

14 session for whatever new conversation occurs.  The real

15 core of what the patent is getting at is the card

16 database and the image database, these are the things

17 that store all of the information that are necessary to

18 create the electronic postcard.

19             Your Honor, I betcha I'm at 10:30 right

20 now.

21             THE COURT:  10:25.  We're going to take a

22 recess right now and take 20 minutes.  Be back ready to

23 come in the courtroom at a quarter 'til 11:00.

24             COURT SECURITY OFFICER:  All rise.

25             (Recess.)

1          COURT SECURITY OFFICER:  All rise.

2          THE COURT:  Be seated.

3          Continue.

4          MR. CHATTERJEE:  Thank you, Your Honor.

5          Now going to the two terms that I am going

6  to be discussing, there are also several other terms

7  that I am prepared to discuss should Your Honor want it.

8          I'll be discussing the server claim and the

9  associate claim limitation.  I can also discuss for Your

10  Honor, identifier, which is very closely related to the

11  associate limitation, card key and then the store

12  related limitations, store, storage device, storing, et

13  cetera.    So turning to the server limitation, the

14  parties have construction dispute, you heard about it

15  before, where Fotomedia is asking for a construction of

16  one or more server computers, and we are asking that it

17  be construed as one server computer.

18          Now I think a good starting point here is

19  to talk about what the dispute is not about.  It is not

20  disputed that there are numerous servers in the

21  architecture, we see that there.  What is disputed and

22  the difficulty that is associated with their claim

23  construction is do all server based steps occur on each

24  physical device, one server computer.  And I think Your

25  Honor really locked on to the issue when you asked the

1  question about the distributed system in 1996.  Because

2  the distributed system as I understood Your Honor's

3  question is about do you have different devices

4  performing separate acts?  And that is really what the

5  dispute's about as far as this claim construction goes.

6           Now, Claim 1 of the '774 describes it, it

7  uses the term a server and then later on uses the server

8  and it describes what all of those steps are.

9           Now Your Honor asked an important

10 question of opposing counsel during their argument which

11 was when they use the term a here and they use the

12 phrase at least one in other places, isn't there a

13 difference, when they knew how to draft things when they

14 meant more than one.  And I think the answer to that is

15 yes.  They knew how to draft at least one and they used

16 it repeatedly in the '774 and '936 patents, and

17 sometimes they did it in the exact same claim, other

18 times they did it in dependent claims.  They didn't do

19 it with respect to the server though.  The server was

20 always a single unitary device.  And the only place

21 where all of the limitations of Claim 1 is met, for

22 example, are in that server computer operating system.

23           As far as the server based steps, there

24 is obviously another dispute as to how the uploaded data

25 works and what step occurs there, is that on the user

1  computer or the server?  But all of the server based

2  steps of Claim 1 are occurring on that aspect of Figure

3  2, the server computer operating system, and all of

4  those are a single physical box.

5              How do we know that?  The way we know

6  that is to first take a look at the state of the art at

7  the time that they described in Figure 1 of the patent.

8  And what they did is they tried to lay out the basic

9  topology of a network, that is how they described Figure

10 1.  And you'll see that there is a PC connected to a

11 modem and a service provider that works through the

12 worldwide web to communicate with the server.

13             Now, there is a very important thing that

14 is not on this picture.  You will see I took each server

15 and I colored them yellow.  There aren't lines between

16 those servers.  The state of the art did not have this

17 distributed architecture where you could connect

18 different servers together to each perform one function.

19 Instead what they taught here is you have a PC engaging

20 with a server to transmit, upload files, manage the

21 links and the like, it was a one-stop-shopping box.  And

22 this server is basically reflected in what's in Figure

23 2.

24             Now, not only does the basic architecture

25 of the system that they talk about in the patent support

this notion of a single server, they also responded to

an office action where they said the same thing in the

file history.  And in response to an office action they

made some remarks at the beginning.  It wasn't

responsive to any particular thing that the Examiner had

identified, they just had an opening remark about what

their presently claimed invention was, and this was the

very first statement they made.  And this section is

actually quite important because we're going to turn

back to it when we talk about the associated term.

But what they said was, a user of the

system transmits data encoding a digital image, an

address for a recipient, an optionally other data such

as a personal message to a server, and the server sends

a message to a specified recipient a message identifying

the uploaded image.

Once again, just like Your Honor noticed,

they didn't say one or more servers, they didn't give

any indication of having a distributed file architecture

where you could do different things on different types

of servers, instead they limited it to one.

Fotomedia acknowledged this in their

brief.  They said, the preamble of Claim 1 is clear, it

states that the recited steps are performed by the

server.  And indeed, the patent has no teaching of a

1  disaggregated function across devices.

2            Now, I had the opportunity to depose Neal

3  Mayle, who is the inventor of the patent.  Now, when he

4  filed for this patent, he was considerably beyond one of

5  ordinary skill in the art.  He has a PhD from MIT, he

6  has a strong background in computer science.  And I

7  asked him, when he drafted the patent and participated

8  in that, does the patent teach anything about how to do

9  things across multiple devices, have this disaggregated

10 function?  And he answered, I believe we described how

11 to do it with a single machine.

12           I also asked him -- and this goes to your

13 enablement point, Your Honor -- well, why didn't you do

14 it on different devices?  Why didn't you have -- because

15 all of these services, he said, were available through

16 different internet companies or other sorts of companies

17 -- I said, why didn't you just connect them together?

18 And here's what he said.  He said, they weren't built to

19 work together.  There wasn't even the idea that they

20 could work together, each one had to be specifically

21 tailored to work together.

22           Now, Your Honor asked the question about

23 enablement, I think this statement by Mr. Mayle is an

24 admission that the patent does not enable the

25 disaggregated functions.  However, when you're looking

1  at enablement in claim construction, I think there is an

2  obvious interplay between the two.  The interplay is

3  what would one of ordinary skill in the art in reading

4  the patent understand that it covers?  What Mr. Mayle

5  said here is that it wouldn't cover this disaggregated

6  function across multiple servers.  It would be a

7  one-stop-shopping box, and that's what's taught by the

8  patent, and that's what one of ordinary skill in the art

9  would understand it to mean.

10             THE COURT:  How difficult would it have

11  been in 1996 to farm out the message sending function to

12  a separate server?

13             MR. CHATTERJEE:  That was essentially the

14  question that I asked right here of Mr. Mayle, and he

15  said it would be very hard, they weren't built to do

16  that.

17             Now, there is also some extrinsic

18  evidence that supports this, that are statements that

19  Fotomedia made in a Canadian prosecution, and obviously

20  this is extrinsic evidence, it is a foreign prosecution.

21  But what they said there, they sought a virtually

22  identical Claim 1 to the Claim 1 that they have in the

23  '774 patent here, and when they were disputing some

24  rejections in the Canadian Patent Office, they made the

25  following statement:  The server in Claim 1 can no more

1  be equated to an entire WAN, that is a series of servers

2  connected together, as a newspaper stand can be equated

3  to the collection of all retail stores in a country or

4  world and the associated interconnecting roads.

5            I struggle with how I could have said it

6  better myself, that the retail stores in their metaphor

7  would be numerous special purpose devices that were

8  connected together through the interconnecting roads.

9  But they said to the Canadian Patent Office, that is not

10  what we're trying to do in this patent.  We're trying to

11  have one-stop-shopping place for our activity.

12            THE COURT:  In the questions that you

13  were asking the inventor, were you focusing on the

14  message sending aspect or were you talking more in

15  general about disaggregating all of the functionality in

16  Claim 1?

17            MR. CHATTERJEE:  I asked him about all of

18  them, and I did ask him about e-mail.  I don't remember

19  the exact question I asked him about that, but he did

20  say that there were external e-mail services, and I do

21  remember asking him a question such as, well, why didn't

22  you just do some sort of programming code to interact

23  with that rather than creating something new?  And my

24  recollection is, Your Honor, and it might be slightly

25  faulty, was that like everything else, he said, it would

1    require a lot more effort than just doing it on a box.

2                    THE COURT:  It would require a lot more

3    effort, but would it require undue experimentation?

4                    MR. CHATTERJEE:  So, Your Honor, the only

5    thing that he said in that regard was they weren't built

6    to work together, there wasn't even the idea that they

7    could work together, and he was talking about all of the

8    functions.

9                    THE COURT:  Right, and my question to you

10   is how difficult would it have been in 1996 to farm out

11   the message sending functionality to a separate server?

12                   MR. CHATTERJEE:  I think that the same

13   problem would exist, it would still be very difficult to

14   do.  Because you would have to have some sort of way to

15   have the database of the system that is in the patent

16   engage with an e-mail service and provide all of the

17   information about how the database worked.  You would

18   have to have some sort of way to handshake the two, and

19   you would have to figure out -- you couldn't customize

20   your e-mail service at all, you'd have to figure out how

21   do you interface with that e-mail service.

22                   And my son says and what Mr. Mayle said

23   is it would be a very difficult thing to do.

24                   Going to the next term is associating.

25   So, Fotomedia's construction is talking about relating,

1 and ours is really directed toward specifically and

2 uniquely relating.

3                    Now, here is the fundamental issue.  The

4 issue is not about whether multiple images can be

5 identified through a single link.  I think Your Honor

6 asked a question about that, is that you could have one

7 identifier identifying a series of pictures that are all

8 coupled together in a photo album.

9                    THE COURT:  On the same web page, for

10 instance.

11                    MR. CHATTERJEE:  On the same web page,

12 but there is an important distinction in that regard.

13 The question is is whether the link is uniquely tethered

14 to one or more images.  And the reason why that is

15 important is is you can think about the Pacer website

16 that the Court has.  I could send a link whenever

17 someone did a new filing, and the link would just

18 identify the Pacer website.  And that would relate at

19 some level to any new docket entry that had been filed.

20 It would relate to it because the information was stored

21 on there.

22                    Or I could send a link from the Pacer

23 system that was specifically correlated to a docket

24 entry, where when I clicked on the link, it would pull

25 up the brief from whatever document had been submitted

1    by the Court.  That is uniquely related.  And you can

2    even see that example when you do an e-filing with maybe

3    five exhibits to a declaration.  Because when I click on

4    the link, it pulls up the web page that has those five

5    different pieces put together.

6                    And this concept of uniqueness is really

7    something that the patent is very focused on when it is

8    talking about associating an identifier.  We see an

9    example of it here in Claim 1 of the '774, associating

10   an identifier of the stored image data.  This is really

11   going beyond just accessing the Pacer website.  It's

12   really talking about accessing something like a docket

13   entry.

14                   And if you look at the patent in the

15   summary of the invention, they repeatedly and

16   consistently talk about this identifier being unique.

17   And that concept of uniqueness really only comes about

18   through the term associate.

19                   Now the Plaintiff doesn't like that term,

20   but the reality is is that throughout the invention and

21   throughout the description all of the preferred

22   embodiments, the summary of the invention and elsewhere,

23   they are always talking about the identifiers having

24   this unique relationship with the specific image.  And

25   actually hearing their argument today, I think they

 1   actually agree with that, but they are trying to use a

 2   much broader term related to, so if I were to just go to

 3   Google's website by clicking on a link, that would

 4   somehow be considered infringing.  And it's simply not

 5   the case that that would be consistent with the language

 6   of the claim.

 7            Again, in the presently claimed invention

 8   office action, they said that the message identifies the

 9   uploaded image.  It is again this very close tethering

10   between the notice -- I will use the term link, they use

11   the term identifier or URL, but it is a very close

12   tethering between the URL and the image itself.

13            And then finally, Your Honor, unless you

14   have questions on the other terms, I just want to talk

15   -- I just want to mention three cases that -- to the

16   extent that Your Honor has not yet had a chance to look

17   at it, that I think are very important in the context of

18   this analysis.

19            One is the Norian case which Fotomedia's

20   counsel mentioned earlier.  The second is the Netcraft

21   vs. eBay case that really is the most current state of

22   the law on the use of the term the present invention in

23   a patent and how that affects claim construction.  And

24   then the final one is Kinetic Concepts Vs. Blue Sky

25   Medical, which really talks about when you only disclose

 1  certain attributes in an embodiment, it can be limiting

 2  on claim construction.  And to the extent Your Honor has

 3  not had a chance to look at those yet, I wanted to

 4  highlight those three cases.

 5              So, unless you have questions on the

 6  other terms, I would like to hand it over to Mr.

 7  Partridge.

 8              THE COURT:  I don't.

 9              MR. CHATTERJEE:  Thank you, Your Honor.

10              MR. PARTRIDGE:  Good morning, Your Honor.

11              THE COURT:  Mr. Partridge.

12              MR. PARTRIDGE:  I am going to speak for

13  20 minutes, and then turn it over to the next lawyer on

14  our side.  Hopefully we can all stick to our time

15  allocations.

16              I am going to talk about three terms,

17  Your Honor, the receiving image data term that counsel

18  for Fotomedia addressed, as well as generate a display

19  term, and thirdly the image data and the digital image

20  term.  I will be very brief as to that one.

21              The three other terms that I am prepared

22  to discuss if you have questions, the term process for

23  which there was some dialogue between you and counsel

24  for Fotomedia, as well as the timing of the associating

25  step, and I may say a few words about both of those in

1  connection with the questions that you asked earlier

2  this morning.

3              The electronic postcards in a dependent

4  claim, no one has addressed that, I will not address

5  that this morning unless you have a question about it.

6              Turning to the first term, receiving

7  image data embodying an electronic image, the image data

8  transferred under control of the user at the sending

9  computer.  Fotomedia proposes no construction, and of

10  course we do.  And as counsel for Fotomedia underscored

11  and as evident from the very question you asked, Your

12  Honor, yes, we do contend that there is an active step

13  here of the user of the system actually sending the

14  image data to the server.  And I'll explain why that's

15  an appropriate construction here.

16              THE COURT:  Why isn't the claim

17  appropriately limited to the receipt of information that

18  has been sent by a user?

19              MR. PARTRIDGE:  And there are three

20  answers to that question, Your Honor, and it actually

21  comes up in my first substantive slide.

22              Why construe this at all which is

23  essentially the question you're asking?  And the first

24  answer to that question, and I will explain how it

25  applies, is that the applicants added this language to

1  the claim to overcome the Wright patent.  And we will

2  look at Wright and see what the implication is of that

3  amendment to the claim relative to Wright.  And by this

4  amendment we contend they actually disclaimed the

5  argument they are making to you which is these are only

6  server steps.  And thirdly, when you actually look at

7  the language that was added by itself, it's ambiguous on

8  its face, Your Honor, and it requires a construction in

9  order to know what it means, and you can only get there

10  by going to the prosecution history and looking at the

11  prior art which is a function for Your Honor rather than

12  the jury.

13              So it is useful, Your Honor, I happen to

14  be reading the Graham V. John Deere case recently in

15  connection with another matter, I hadn't read it in a

16  few years, and I found this in Graham V. John Deere that

17  fits the very points we're raising here, and what they

18  said in that case is:  Claims as allowed must be read

19  and interpreted -- the Supreme Court is saying this  --

20  with reference to rejected ones and to the state of the

21  prior art.  And it goes on to say that claims cannot be

22  sustained to cover that which was previously by

23  limitation eliminated from the patent.  And this is the

24  point of the construction we're raising here.

25              So what did the applicants actually do?

1   Well, to get the patent, they had received a rejection

2   based on the anticipation over the Wright reference, and

3   they made an argument and they said the system of Wright

4   teaches selecting a greeting card image stored on a

5   central image server.  And they said the presently

6   claimed invention is directed to a system wherein the

7   image data is created by the sender and not selected

8   from a selected -- a pre-existing list of greeting card

9   images.

10                   This argument occurred before they

11  actually amended the claims.  And what happened at this

12  point in time is that there was an interview between the

13  applicant, applicant's counsel and the patent office.

14  Unfortunately, contrary to the rules at that time

15  neither the applicant nor the Examiner said what

16  happened in that interview, but the end result of that

17  interview was the language that we see in the claim, and

18  the underscored language is what was added.  The image

19  data transferred under control of the user at the

20  sending computer.  And then the phrase about image data

21  either residing in the sending computer or a source

22  separate from and in communication with the sending

23  computer.  That is the language that they added that

24  then resulted in allowance over the Wright reference

25  which was used for anticipatory purposes.

1                Now it is interesting when you go back

2    into the specification and you look at how they

3    characterize this invention, and you go to the

4    background of the invention, and the very last sentence

5    after they have talked about what preceded is this:

6    None of the current mechanisms allow the user to

7    transfer -- the user to transfer a digital photograph to

8    a server where it is then processed, et cetera.

9                They further say in the specification, in

10   the last section of the specification there is a portion

11   of it entitled variations.  And within that section

12   entitled variations, they talk about the preferred

13   embodiment and some modifications to the preferred

14   embodiment which really consist of only adding more

15   photographs, a baby album, a family album, but it

16   doesn't change the nature of the invention one bit, and

17   they describe this as the full scope of their invention,

18   and they characterize the present invention at that

19   point as requiring the user to upload image information

20   for processing by the server.  So this is what we get

21   from looking at the claims, now looking at the

22   specification.

23                Now let's see what happened in connection

24   with the rejection over Wright.  I think that there are

25   a couple of points that are clear and really aren't

1    subject to debate here.  The applicants intended to

2    distinguish the operation of Wright's server with what

3    they did because of that rejection.  We would contend

4    that Fotomedia's argument results in no difference

5    between the operation of Wright server and the claimed

6    server.  Why is that?  They seem to be saying that it is

7    enough of a distinction with respect to a claim that is

8    directed only to the method of operation of a server

9    that the retrieved information is in the nature of an

10   image that somehow got there from a user, but the steps

11   of the server in Wright are the same with their

12   construction.  There is no difference in the application

13   of Wright to this claim if it is limited to the server

14   than it was before the amendment was made.  The amended

15   claim if only directed to the nature of the transferred

16   image doesn't say anything about the nature of the

17   operation of the server itself.

18              We contend the addition of the sending

19   step by the user is what actually distinguished Wright,

20   and why is that?  Let's take a look at Wright itself.

21   And, Your Honor, I realized in preparing this morning

22   that we had not given you a copy of Wright, obviously

23   you can find it yourself on the system, but I have a

24   couple of copies if you would like me to hand them up

25   this morning.

1          THE COURT:  I would.

2          MR. PARTRIDGE:  So, now looking at

3   Wright, what did Wright have?  Well, I first said my

4   third point was that transferred under the control of

5   the user could be ambiguous unless it is construed by

6   you.  Well let's look at why that is the case.

7          Wright disclosed an electronic greeting

8   card system in which a user, the sender or the personal

9   communicator, communicated with the server which was

10  connected to an image library.  That is what's disclosed

11  in Wright.  And if you will remember in the claim

12  language, they added this phrase -- go back to the first

13  slide in this series which shows the -- yes, this one

14  right here.

15          If you -- when you look at this phrase it

16  says, or the image source separate from and in

17  communication with the sending computer as an

18  alternative to the image coming from the sending

19  computer.  When you go back to Wright, if that language

20  is not construed in the context of a user uploading an

21  image, then the sender at a personal computer

22  communicating with a server and asking the server to

23  withdraw from storage -- from the image library, which

24  is this other source, an image, is not distinguished

25  over Wright.

1            Let's walk through this a little bit.  So

2 Wright's library could be an image source separate from

3 and in communication with the sending computer as

4 recited in Claim 1.  In which event, the sender commands

5 a transfer from the storage device connected to the

6 server of Wright, and then that card is delivered to a

7 recipient.  There is no difference between that claim

8 because of the alternative language in the phrase and

9 Wright, if you use Fotomedia's construction.

10            So what was intended here by the change

11 to the claim?  It can't be Fotomedia's construction

12 because then the patent is -- the claim is unpatentable

13 over Wright, it doesn't distinguish Wright.  So there

14 must in fact be the active sending by the user of an

15 image in some form, and the language that we have

16 crafted does exactly that.  That would be an arguable

17 distinction over Wright, which Graham V. John Deere says

18 you have to look at the rejected claim versus the

19 allowed one compared to the prior art and determine

20 whether or not there is something in what was added to

21 change the claim when they gave up the original scope

22 that distinguishes that claim over the prior art.  And

23 this is the only thing that arguably does that.

24            THE COURT:  If the -- can you go back to

25 that slide, please?

1          MR. PARTRIDGE:  Sure.

2          THE COURT:  If the claim is construed as

3  receiving at the server the image data sent by the user

4  from the sending computer, wouldn't that overcome

5  Wright?

6          MR. PARTRIDGE:  Could you say that again,

7  Your Honor?

8          THE COURT:  Receiving at the server data

9  the image data sent by the user at the sending computer.

10          MR. PARTRIDGE:  You still -- when you

11  look at the claim as a claim directed then only to the

12  server, the operation of the server of Wright is still

13  identical to the claim.  The only difference is that it

14  is now operating on a different piece of data.  Instead

15  of having a photograph of the Statue of Liberty, it is

16  now a photograph, a picture, you know, I took of my

17  family.  There is no difference in the operation of the

18  server itself.  If the claim is limited to the steps

19  carried out by the server, then there is no difference

20  between that construction and what Wright discloses.

21          THE COURT:  Except the server in Wright

22  didn't operate on image data that was sent by the user.

23          MR. PARTRIDGE:  Well, you know, actually

24  even that point is debatable, Your Honor.  When you look

25  at Wright -- if you look at Column 7 of Wright, top of

1  the column of Wright says -- and he talks about personal

2  messages that are created by the user of the system and

3  says, the message that he just described which would be

4  the message that would be inside the greeting card that

5  is sent, just examples of personal messages that a user

6  can attach to the electronic greeting card and other

7  types of input devices, 114, may be used to enter a

8  personal message which is coupled with the electronic

9  greeting card for sending to a party.  So that Wright

10  actually talks about uploading from the sending computer

11  data to be included in the greeting card that is then

12  sent to the receiver.

13              THE COURT:  Image data?

14              MR. PARTRIDGE:  It says it can be any

15  kind of a device, and as we know -- any kind of device,

16  114.

17              THE COURT:  I know, but the data, is it

18  image data?

19              MR. PARTRIDGE:  He does not specifically

20  say image data, he says any kind of a device.  And as

21  you know, from the patents that are at issue here, those

22  patents say that hooking up a video camera, a scanner or

23  anything else, it was a simple matter to do.  In fact,

24  the only disclosure of that is just the drawing that

25  depicts those blocks.

1              So, you know, I don't think the question

2  you asked results in a difference in the actual

3  operation, the steps of the server, the steps that are

4  recited in the claim, and the only thing that one can

5  argue might distinguish Wright is if the user is

6  uploading image data to the server to then be used at

7  the server through the operation of a program to create

8  an image to be sent to particular recipients.

9              Go to Slide 17.

10             So our point is, Your Honor, while the

11  original rejected claims actually addressed server

12  functions, it is true, it was a list of server

13  functions, the amended claims no longer cover only

14  server functions.  The server language in the preamble

15  cannot outweigh the added language of the claim that

16  requires a user to send the electronic image to the

17  server to be processed.

18             And, in fact, they can't really have it

19  both ways, and the courts have recognized this, in the

20  North American Container case cited in our brief, the

21  court preserved an inconsistent use of a term -- it was

22  actually in the same claim, where a term was construed

23  one way for one purpose in the claim because there was

24  prosecution history related to that in which an

25  amendment was made of that term, and the court said,

1  well, that term has to be construed more narrowly as a

2  consequence of that, but the same term used elsewhere

3  was not construed in that same way.  And the court said

4  that in that instance prosecution history in an

5  amendment to a claim to obtain allowance controls.  And

6  so the language in the preamble that says the server

7  carrying out the following functions, does not trump the

8  fact that that claim was amended to add a user sending

9  the image to the computer.  That language trumps the

10  language in the preamble of the claim.

11              So turning next to the generate a display

12  limitation, Your Honor.  Unfortunately in the briefing

13  this term was separated and Fotomedia's argument

14  separates the terms.  They really go together.  I don't

15  think you can look at generate and then look at display.

16              THE COURT:  I understand your argument

17  was you wanted a construction of generate a display.

18              MR. PARTRIDGE:  That is correct, Your

19  Honor.

20              And let's go through why that

21  construction is proper.  When you look at Claim 1, it is

22  true that it is a system claim, but it only has one

23  element.  It is a server.  The server includes amongst

24  a list of sub-elements a CPU.  When you look at the CPU

25  limitation, it is described entirely as a program.  It's

1  a method.  It's A, B, C, D method steps.

2           And so let's look at the overview of the

3  claim, functional steps of the CPU, input user

4  information, store the user information, process the

5  image data, generate a display including at least a

6  portion of the processed image data, associate a URL

7  with the display.  Those are steps.  And the step of

8  generating a display follows the processing step and it

9  precedes the step of creating the URL.  And your

10 question earlier this morning about can you create a URL

11 when you don't have a display?  Well, they don't do that

12 in any of the embodiments, as counsel admitted when

13 getting up the second time to discuss that issue, and in

14 the claim itself it provides a structure for generating

15 both the display and then associating a URL which

16 grammatically follow each other.

17           But the point of this really turns over

18 how display -- how a display is generated in this

19 system.  It is in our view more than merely image data.

20 It's fixed and it's a visual representation.

21           The Phillips case, as you know,

22 identifies a couple of situations in which the

23 specification can be used to limit the claims.  One of

24 those is when the applicant acts as his own

25 lexicographer, we think that is applicable here.  And

1  the second is when the patentee intends for the claims

2  and the embodiments in the specification to be strictly

3  coextensive, we think that is applicable here as well.

4           Turning to the first, the abstract, and

5  this is the abstract as written originally in this

6  application, and they kept it the same in both patents

7  throughout, and the abstract itself defines the display.

8  This is not in the briefs, Your Honor, it should have

9  been, but here is the definition of display:  Comprising

10 a mixture of image and textual data.  They defined it,

11 image and textual data.

12          In the specification, again in that

13 variation section where they summarize the nature of the

14 preferred embodiment and the other embodiments, the

15 present invention requires the user to upload image data

16 that is processed by the server into a display for

17 viewing.  It is all about creating a display for viewing

18 according to the present invention.

19          And, in fact, when you look at the

20 specification, that is actually what happens.  Message

21 is created, an image is added, a caption is added to the

22 photograph.  And this is in Figure 11 what is meant by

23 generating a display.  The display is generated by the

24 user at the server, and this is what it looks like.

25          In the specification at the conclusion of

1  that set of figures, there is a discussion of the

2  resulting image.  It is compressed, converted into an

3  image format, viewable in a web browser such as GIF or

4  JPEG, fixed images, Your Honor.  That is what those are.

5           The display is visual.  It is not a

6  series of binary digits.  It is something for viewing.

7  The claim says that, generate a display, a display that

8  is available for viewing to allow the at least one

9  recipient to view the display using the URL.  It is

10  something for viewing.

11           It is not even a description.  A

12  description is not the display.  You can describe what's

13  in the picture, but the picture is the display that the

14  patent is talking about.

15           So Fotomedia's construction that it is

16  data that may be viewed ignores the definition in the

17  abstract.  It ignores the present invention statement.

18  It ignores the description of how fixed displays are

19  created, and those are the only types of displays

20  described in the entire specification.  And it ignores

21  the claim requirement of viewing.

22           And what do we get in the reply brief?

23  There is this straw man of blinking which probably

24  doesn't demand much explanation, but I will say that the

25  spec says nothing about blinking.  JPEG and GIF files

1  are by their nature fixed, and even a blinking function

2  has to do with the rate at which a fixed JPEG and GIF

3  file is displayed.

4             And even if you get to the point of

5  looking --

6             THE COURT:  Are -- excuse me.  Are JPEG

7  and GIF files fixed always?

8             MR. PARTRIDGE:  In the context -- in the

9  specification they describe a series of steps that gets

10 to a JPEG, two JPEG and GIF files.  One of which is

11 stored in that image database and the other is stored in

12 that card database.  Those are both fixed images, stored

13 there that are then accessed directly as Mr. Chatterjee

14 described by the URL.  Is there some technical situation

15 where a JPEG or GIF file could not be fixed, I am not

16 aware of it, Your Honor, but I'm not enough of an expert

17 in that to give you necessarily the correct answer.

18            And the last thing I wanted to talk about

19 very briefly is the digital image, the image data which

20 we say should be construed, that it is the uploaded

21 unprocessed image data.  That is what we say.  And

22 unprocessed is in there not because we're trying to read

23 something into the claim, but it is because of what they

24 want to try to argue about a claim that clearly is

25 addressing a digital image that has not yet been

1  processed, and you can tell that from looking at the

2  claim itself.

3              Method Claim 8 of the '936 begins with

4  allowing a user to upload a digital image, and then

5  referenced throughout the patent to the digital image,

6  throughout.  It is referencing back to the very same

7  thing.  This is a basic antecedent basis issue, Your

8  Honor.  And I would add if we can go to the ELMO with

9  respect to the issue raised by counsel about

10 unprocessed.

11             This is Claim 1 of the '936 patent, Your

12 Honor.  And here we see that it refers to an electronic

13 image data, process the electronic image data.  And the

14 key here is, Your Honor, when they wanted to talk about

15 process the electronic image data, they knew how to put

16 it in the claim.  So, in some claims they really meant

17 processed electronic image data, and in other claims

18 they did not.  And so in the claim that I used as my

19 example where we think antecedent basis law controls,

20 the construction of that ought to be the unprocessed

21 image that has been uploaded by the user.

22             And, Your Honor, I have burned a little

23 more time than I intended, but I think it is just worth

24 noting a couple of things that came up on those other

25 terms.

1            It is interesting with respect to

2   associating a URL with the display.  You asked the

3   question does the spec show creation of a URL before the

4   display, and the answer was nothing indicates that it

5   could not be.  That is correct, Your Honor.  There is

6   nothing in the spec that suggests otherwise, but more

7   importantly the claim structure itself grammatically and

8   consistent with the specification requires that the URL

9   is created after the display has been generated.  The

10  claims don't talk about regeneration, they don't get

11  into a session operation where one might be refreshing

12  either the URL or refreshing the display, they talk

13  about the generation of the display by the user in the

14  first instance.

15            The other thing I would point out, Your

16  Honor, the other side cited the Creative Internet case,

17  that case involved apparatus claims.  We're talking

18  about method steps here.  It is not applicable to the

19  method steps that are addressed by this particular

20  limitation.

21            The last issue concerns the issue of

22  process -- excuse me, processing and storing, that was

23  the issue.  And as I think you pointed out in your

24  question, the claim has a step for storing and a step

25  for processing.  It is the claim that then controls.

1    The claim says what storing is and it says separately

2    that the thing that is stored is then processed.  You

3    cannot get around that distinction by talking about what

4    may temporarily happen in a buffering and in a temporary

5    storage process when a CPU is carrying out a

6    manipulation operation, and for some moment in time

7    something is stored in some storage register during that

8    manipulation process.  That is not what storing and

9    processing are about in this claim.

10              And the reason we say processing does not

11   include storing in the claim is because storing is

12   separately stated as a step and element of the claim.

13              Thank you, Your Honor.

14              MR. DUNHAM:  Good morning, Your Honor.

15              THE COURT:  Good morning.

16              MR. DUNHAM:  My name is Tom Dunham, and I

17   represent three of the Defendants in the Alltel case,

18   that's Verizon Wireless, Sprint and Alltel.  And I'm

19   here to discuss a couple of terms from the '774 and '936

20   patents.  I'll be focusing on the computer terms, but if

21   the Court has questions on the browser term or the

22   message and message address terms, I would be happy to

23   address those as well.

24              The main dispute with the computer terms,

25   and the word computer appears in several places,

1  Fotomedia has proposed a very generic construction.

2  That a computer is a device having a processor for

3  processing data.  And the Defendants contend that the

4  computer terms are more properly limited to a personal

5  computer.

6              If I may, I would like to take one second

7  and explain why this is important, and it really relates

8  to the fact that the Defendants in the Alltel case are

9  cell phone providers, service providers such as Verizon

10 Wireless.

11             THE COURT:  So, you would be happy with

12 any construction of computer that said a computer other

13 than what might be found on a cell phone.

14             MR. DUNHAM:  That is correct,

15 essentially.

16             THE COURT:  Right?  Okay.

17             MR. DUNHAM:  But let me explain why, and

18 it's not just that that's what I'm seeking, but I will

19 be honest with you.  If we can take the ELMO here and

20 look at the first page from Fotomedia's actual opening

21 brief.

22             Did you zoom this in?  Ah, here we go.

23 Let me back up here.

24             This is the first page of the opening

25 brief from Fotomedia, and in what they describe as the

1  overview of the patented technology.  They have done

2  something that I think is very interesting here.  They

3  give an example of the invention, they say, a website

4  communicates image information with the sending and

5  receiving computer, which they go on in the

6  parenthetical to say it could be a camera phone, a

7  personal computer, the word that they don't like in

8  their brief, personal, a PDA, et cetera, any computer

9  device that can transfer images to or from a website.

10             And notice that they try to back away

11  from the word computer and now what they want to do is

12  call it a computer device.  I think they recognize right

13  from the start that there is no disclosure in the '774

14  or '936 patents of any sort of cell phone or PDA, it is

15  all about computers.  And in the opening section of

16  their brief, they try to sort of obscure this issue by

17  referring to camera phones and personal computers and

18  PDAs as if they are computers and then they back away

19  and refer to them as computer devices.

20             THE COURT:  How does the patentee account

21  for improvements that might be made in the future?

22             MR. DUNHAM:  Well, I think that's an

23  interesting question, and if I can toggle back -- we can

24  go back to the slides here.

25             The background of the specification, I

1    think, is instructive in part on this point.  If we look

2    at what the inventors did, they explained what advances

3    in technology had permitted them to undertake the work

4    that they did to create their electronic postcard

5    system.  And I have two quotes here out of the

6    background that are important.  First, the inventors

7    acknowledged that there were certain advances relating

8    to digital photographs and digital photography that made

9    their work possible.  One was the penetration of

10   powerful personal computers in the home environment.

11            Now what they do is they describe some

12   preferred embodiments, sort of the minimum requirement

13   that would be necessary and they explain it right here.

14   They say, these new computers can run complex processing

15   applications.  They typically have a 32-byte processor,

16   a large memory array, high capacity mass storage, high

17   res color monitor and a fast modem.  In essence what

18   they have done is they have drawn a line in the sand,

19   and they say, we need this to implement our invention at

20   a minimum.

21            So, to the Court's question, for advances

22   in technology what they are saying is if you have

23   something more advanced than this, more powerful than

24   this machine, they contend that their system would still

25   operate with that type of technology.  And that is how

1  they have accounted for advances in technology, but they

2  have drawn a line as to the base line.  We have to have

3  at least this.  They also go on in the background, and

4  this is not in any preferred embodiment, but the lower

5  quote explains how the system would work.  It says, the

6  events have created a situation where an individual at

7  home can download images captured by a digital camera or

8  a scanner into their home computer, connects the web and

9  transmits the picture on.  What they don't say is you

10  can use some other device.  They certainly could have if

11  they had thought of it, described using a device other

12  than one of these home computers to download images from

13  a digital camera or to somehow place those images on the

14  internet.  They didn't do that because it is not

15  something that is disclosed in the patent.  I submit it

16  is not something that they had contemplated.

17              THE COURT:  What technology existed in

18  1996 to that extent?

19              MR. DUNHAM:  In 1996, 1997 certainly the

20  state of the art would be similar to what is described

21  here in terms of home computing capabilities, a 32-byte

22  processor and sufficient memory and displays.

23  THE COURT:  Integrated digital camera and a telephone?

24              MR. DUNHAM:  Really was not something

25  that had been developed in 1996.

```
 1              THE COURT:  A telephone with browser
 2  capabilities.
 3              MR. DUNHAM:  Again, not something
 4  existing in 1996, not surprising that it's not
 5  disclosed.  In essence, Fotomedia can point to no
 6  disclosure in the patent suggesting even remotely that
 7  the inventors thought of using anything else other than
 8  a computer, and a computer meeting certain base line
 9  requirements.  Certainly in 1996, 1997 to the extent you
10  could even find a non-computing device that took images,
11  it would not be meeting these types of requirements.
12              If we look at the embodiments that are
13  described in the patent further, I think it is even more
14  instructive.  With reference to Figure 1, and we have
15  just placed part of it before the Court here.  It shows
16  a personal computer, I don't think it's by mistake that
17  it's labeled a PC, and the inventors explained, that's
18  their present invention.  As Mr. Chatterjee explained
19  earlier, it is a personal computer that can receive
20  input information here shown from an electronic camera
21  or a video recorder, and then can output that
22  information.  There is shown a modem to communicate with
23  a network or the world wide web.  There is a printer
24  there and another device, maybe a scanner, it's a little
25  hard to tell.
```

1           Further with regards to Figure 2 in the

2   patent, this is explaining what the software

3   capabilities of the personal computer would have to

4   have.  This is similar to the background of the

5   invention where the inventor said certain advances in

6   technology have established a base line that is

7   sufficient for us to do our work in generating and

8   creating these electronic postcards.  Now we look at

9   what has to be from a software perspective included on

10  that computer.  Figure 2 shows us, the personal computer

11  operating system has to support a browser, has to

12  support some sort of file system that can store the

13  files and have some sort of mail reader, and that's to

14  interact with the network and to send and receive e-mail

15  messages.  Again, this is not the type of technology

16  that would have been found in PDAs or cell phones back

17  in 1996, 1997, and I believe that is why it is not

18  disclosed in the patent.  There is no mention whatsoever

19  of it.

20          Going on with the description in the

21  patent of the invention, there is references to how the

22  computer operates, Figure 3a and Figure 3b are two flow

23  charts and they again refer to the steps that are

24  executed as described in the patent by the personal

25  computer of the present invention.  It is clear that

1  every time the inventors talked about a computer, they

2  talked about a PC or a personal computer, and they had

3  established a base line for the requirements of that

4  computer unambiguously in the background section of the

5  patent.

6          Describing a little bit further the

7  operation of the invention, the patent goes on to say,

8  well, here is how it works.  The computer may interface

9  to a variety of peripheral devices, and I think this is

10 a point that is very important.  The notion of the

11 computer being able to interface with other peripherals

12 again is fundamental to the implementation of the

13 alleged invention.  The notion was, I have my digital

14 photographs or digital videos, whatever content I have,

15 I need a computer that can interface with devices to

16 receive that content and then has sufficient power to

17 transmit that content out using a mail application or

18 other transfer protocol.

19          This is clearly shown and described in

20 Figure 1.  It's clearly described in the specification.

21          What Fotomedia is trying to do is to say

22 all we need for a computer is a device having a

23 processor for processing data, very generic description.

24 In 1996, 1997 that could cover a digital wristwatch.  A

25 digital wristwatch has a processor, processes data and

1  it displays time.  It clearly has nothing to do with the

2  invention, the alleged invention here.

3                As we described in our brief, there were

4  some other examples we gave of different types of

5  devices that were digital in 1996, 1997, an alarm clock

6  for example.  Again, devices that were not able to

7  process data, not in the manner described in the patent,

8  certainly not to process digital image data.

9                So what the Plaintiff has done is

10  proposed a construction that wouldn't even meet the

11  basic requirements of the specification, which I submit

12  is consistent throughout.  Establishing a base line of

13  technology in the background section, and then planning

14  for further advances in that technology through saying

15  the minimum requirements of performance in interface

16  must be met.

17                To address one final point.  I --

18                THE COURT:  Excuse me just a second.  You

19  may want to slow down just a little bit.

20                MR. DUNHAM:  Sure.

21                THE COURT:  Okay.  I just --

22                MR. DUNHAM:  I'm sorry.  I'm looking at

23  the two minute warning too here.

24                THE COURT:  I understand.

25                MR. DUNHAM:  To sort of sum up, there is

no disclosure that Fotomedia has been able to point to

in the specification, the prosecution history, no where,

that anything other than a personal computer is what is

contemplated or disclosed by the inventors.  And in

terms of the argument that Fotomedia has accused the

Defendants of trying to limit the claims to the

preferred embodiment, the preferred embodiment is

actually a computer with specific processing

capabilities, i.e., the 32-byte processor and certain

other features of connectivity, and then also specific

examples, an Apple MacIntosh computer and a certain IBM

computer were both disclosed.

            The Defendants are not attempting to

limit the scope of the claims to those particular

attributes or those particular embodiments, but we think

that the jury will understand a personal computer is

quite different from a cell phone, and particularly in

1996, 1997, and we think it's very important that the

background of the patent explains in order to allow the

applicants to even pursue their invention, they needed a

certain minimum threshold of computing technology, they

took the time to explain that to us, and it is not

proper for them to try to back away from that now.

            Lastly, the Plaintiffs have suggested

that limiting the scope of claims to an invention that

1  may at some times be referred to as a preferred

2  embodiment is improper, and if the Court hasn't had a

3  chance to look at the decision in the dot.com case, this

4  is an example of several -- one of several cases cited

5  in our brief, where the Federal Circuit has indeed

6  looked at what was described at least at some points in

7  the specification as a preferred embodiment, and none

8  the less held that that is actually proper in terms of

9  the scope of the claims given the entirety of the

10  disclosure.  And we submit that the decision reasoning

11  applies equally in this case.

12            If you have any questions on the other

13  terms, I'm happy to address them or I will pass the

14  torch.

15            THE COURT:  Thank you.

16            MR. DUNHAM:  Thank you.

17            MR. RAMSEY:  Good morning, Your Honor,

18  I'm Gabe Ramsey, counsel for Photobucket, and I'm going

19  to be taking up the '231 patent, the last patent that's

20  at issue in this case.

21            You know, before I do so, I'm only going

22  to address three particular terms in the '231 patent,

23  that's all I have planned.  I can take up questions on

24  other terms, but in the interest of time, I am going to

25  limit the discussion to roles, associating roles with

1  individual metadata elements, and metadata elements for

2  an image.

3  Before I dive into the particular terms

4  and phrases, however, I want to provide a little bit of

5  context about our approach and the background of the

6  patent.

7  First of all as with the other patents in

8  the case, the Defendants have approached claim

9  construction from the perspective of one of ordinary

10  skill in the art.  We have in mind that one of ordinary

11  skill in the art would be a person with a bachelor's

12  degree in computer science, computer engineering or the

13  equivalent, and one to two years of experience building

14  or working with access control for file storage systems.

15  Very similar in some respects to the person of ordinary

16  skill in the art for the other two patents in this case.

17  But the '231 patent is a patent involving different

18  technology, a number of years later, four to five years

19  later and a different inventor than the original two

20  patents that we've addressed today.  So, our person of

21  ordinary skill in the art reflects that.

22  Second, it's -- to deal with claim

23  construction of any of the terms of this patent it's

24  important to keep two basic fundamental aspects of the

25  '231 invention in focus.

1            The first of these is that the '231

2 patent involves access based on roles.  This concept of

3 roles is critical to the invention.  The concept of

4 role-based access is different from -- than prior art

5 systems that simply involved identifying a user and

6 allocating access rights or permissions to that user.

7 That simple interaction was already well known in the

8 prior art.  We indicated in our brief the inventor's

9 discussion of that.

10            This concept of role-based system using

11 an intermediary designation to control access is

12 different -- what was different from the prior art, so

13 we've got to keep that in mind.

14            The second major essential feature of

15 this invention is that access control was contemplated

16 to provide very granular access on an individual

17 metadata element by metadata element basis.  This is not

18 a system that involved access control to sets of images

19 or albums or all of the metadata that may be associated

20 with an image.  That too was known in the prior art,

21 it's discussed in the prosecution history, and was

22 discussed by the inventor during the deposition.

23            The patent instead focuses on control to

24 individual metadata elements, and I will talk a little

25 bit more about that.

1          With those two basic ideas in mind, I

2   will turn to the construction of roles.

3          Defendants propose a construction of

4   roles as intermediary designations to bring together

5   users and access privileges.  And I should point out

6   that the Defendants' construction is very slightly

7   changed from in the briefing.  We have been continuing

8   to communicate with the Plaintiff and address a couple

9   of points in their reply brief.  We have changed

10  permissions to --

11              THE COURT:  Excuse me just a second.

12              MR. RAMSEY:  Yes.

13              THE COURT:  The same admonition.  You

14  have to slow down.

15              MR. RAMSEY:  Slow down, and I don't even

16  have my two minute warning yet.

17              THE COURT:  Yes, you do.

18              (Laughter.)

19              THE COURT:  So, please -- I'm serious.

20              MR. RAMSEY:  Very good.

21          We have changed permissions to access

22  privileges to address Plaintiff's taking issue with that

23  point.  We have removed the word collections from the

24  construction.

25              So, the Defendants' construction again

1  for the record is intermediary designations to bring

2  together users and access privileges.

3            This concept of roles is not coextensive

4  with the users of a system.  Roles are not users.  Roles

5  are also not coextensive with the access privileges that

6  a user might be assigned, that they are allowed under

7  the system, it is not coextensive with that concept

8  either.  Rather roles are an intermediary designation, a

9  separate, independent and discreet construct that bring

10  together the users on the one hand, and the access

11  privileges that an individual user may be assigned on

12  the other.

13            And an analogy that we have used and

14  found helpful is a protective order in the litigation,

15  and I offer that as an analogy.  In a protective order

16  system, which is a kind of system of access control,

17  there may be a role, outside counsel.  I, as a user of

18  that system, to determine whether I have access to

19  certain information that is governed by that role, the

20  system doesn't care that I'm Gabe Ramsey.  It doesn't

21  care who the individual user is.  It merely asks the

22  question, what is the role?  And if the answer is

23  outside counsel, then -- and the system understands that

24  role as being the requestor of access, then access to

25  the information is granted.  Merely offered as sort of a

1  practical -- a practical nuts and bolts analogy to help

2  understand the concept of roles in this patent.

3              Defendants' construction of why should it

4  be adopted?  First of all, it is precisely supported by

5  the structure and the plain language of the claims of

6  the '231 patent.  And particularly I have highlighted

7  here elements B, C and E of Claim 1 of the '231 patent.

8  The structure is repeated through all of the claims.

9  The claims of the patent involve first, associating

10  users with roles; second requires associating roles with

11  individual metadata elements; finally in Element E

12  involves comparing the users' role to the roles

13  associated with the metadata elements.

14              In this structure, clearly the role is

15  acting as an intermediary between the user on the one

16  hand and the access privileges that are granted, and

17  what those may be on the other end of the system.

18  Defendants' construction simply reflects this

19  understanding in the plain language in the structure of

20  the claims.

21              Second, Defendants' construction is

22  supported directly by Fotomedia's own extrinsic evidence

23  in their brief.  And this is how we came to our current

24  formulation attempting to narrow the dispute with the

25  Plaintiff.  In particular the article regarding

1  role-based access control models that Your Honor

2  mentioned during Plaintiff's presentation, defines roles

3  as a -- a role is both a collection of users on one side

4  and a collection of permissions on the other.  The role

5  serves as an intermediary to bring these two collections

6  together.  This is directly consistent with the

7  Defendants' proposed construction.  Plaintiffs cited it

8  in their own brief.

9            In the slide that is up right now, there

10 is also a graphical presentation of roles from that same

11 article cited at Exhibit G to Plaintiffs' brief.  We can

12 see that roles is a discreet, distinct intermediary

13 construct, an intermediary designation that is different

14 from users and the permissions and mediates between the

15 two in order to determine access.

16           Now another important aspect about roles

17 is that they are defined before access privileges are

18 assigned.  They are not the same as access privileges.

19 In particular the patent in the case that each role is

20 assigned certain access privileges.  Inherently in that

21 structure a role is an independent construct that is

22 defined by whatever features may define it, and then the

23 next step is access privileges are assigned to that

24 role.  Roles are different than access privileges.

25           Well, as a practical matter what kind of

1  things are we talking about here, roles?  Well, roles

2  may be selling agent, appraiser, seller in the real

3  estate example in the patent.  In the patent it also

4  refers to job titles as an example of a role, that is

5  also reflected in Plaintiff's brief.

6              Again, intermediary designations between

7  a user and an access right.  Those are not privileges,

8  they are not users, they are these intermediary

9  designations.

10             The problem with Fotomedia's construction

11 is that it improperly collapses the concept of roles and

12 privileges.  And just to sort of get to the nub of it,

13 the mischief here is that Fotomedia is attempting to say

14 in their construction, designations for access

15 privileges to which one or more users may be associated,

16 they are attempting to say that in the collection of

17 access privileges inherently defines a role.  That is

18 conflating the concept of roles and access privileges.

19 As I have indicated, roles are defined before these

20 access privileges are assigned.  The problem with this

21 construction is that it would -- if adopted, it would

22 encompass the prior art.  It would encompass the system

23 that simply involved a user requesting to the system

24 being allocated certain access rights, some collection

25 of access rights.

1              Under this construction, that may be

2    considered to have a role when there is no intermediary

3    designation called a role.  It reads the concept of

4    roles out of the claims, and for that reason it is

5    flawed and should be rejected, and Defendants' supported

6    construction should be adopted.

7              Now having taken up roles, I will move on

8    to the phrase associating the roles with individual

9    metadata elements.  Defendants' construction is that for

10   each of a plurality of metadata elements, assigning a

11   list of roles to the metadata element.

12             Defendants' construction reflects first

13   that there is more than one metadata element than the --

14   under the plain language of the claims.  The claim

15   refers to associating the roles with individual metadata

16   elements, plural.  Defendants' construction captures

17   that, Plaintiffs' does not.  In fact, Plaintiffs' does

18   not offer a construction.

19             Second, Defendants' construction reflects

20   that roles are assigned to each individual metadata

21   element.  Again, this is consistent with the plain

22   language of the claim in which roles are associated with

23   individual metadata elements on an individual basis.

24   Accordingly, Defendants' use of each is consistent with

25   the claims.

1            Sort of backing up, again the point of

2  the invention here was to provide very granular

3  element-by-element access to metadata, and the patent

4  observes that in the prior art when a user accesses the

5  image, the user is typically shown all of the metadata

6  associated with that image.  Similarly the inventor said

7  that at the time of the invention, metadata -- images

8  and metadata were treated as a single unit.

9            THE COURT:  You need to slow down, okay?

10            You have used -- the Defendants have used

11  about an hour and ten minutes.

12            MR. RAMSEY:  Oh good, okay.

13            THE COURT:  Are you -- are these the last

14  terms I'm going to hear about?

15            MR. RAMSEY:  We have got one more after

16  me.

17            THE COURT:  Okay.

18            MR. RAMSEY:  The inventor contrasted his

19  invention to this prior art by saying that in his

20  invention metadata was about an image, is treated

21  separately from the image with respect to access.

22            Finally, in the prosecution history, in

23  emphasizing the acts that roles are associated with

24  individual metadata elements, the applicant

25  distinguished over prior art that involved access to

1  sets of images or albums in all of the metadata

2  associated with those things.  Again, it is very

3  important here that access is on an element-by-element

4  basis.  Defendants' construction reflects that reality

5  in the claims.

6            So how does this association of roles

7  with individual metadata, how is it carried out?  Well,

8  the patent repeatedly refers to assigning lists of roles

9  to individual metadata elements.  Over and over again

10 that structure is described, and Defendants'

11 construction reflects that idea.

12           THE COURT:  What is the difference

13 between the list data structure and the table data

14 structure?

15           MR. RAMSEY:  In the Defendants' view they

16 are essentially the same.  We see that a list or table

17 is both a listing of some sort that would include the

18 roles that were associated with an individual metadata

19 element.

20           THE COURT:  Well, the patentee looked

21 like he viewed them differently.

22           MR. RAMSEY:  Well, I think if it would

23 solve the question, including list or table in the

24 construction would be acceptable.  Defendants simply see

25 them the same, and were providing a concise way for the

1  jury to understand the term.  But it is this concept of

2  listing of some sort of the roles that are associated

3  with an individual metadata element as opposed to all of

4  the metadata.

5            So again, Defendants' construction is

6  consistent with all of the disclosure in the

7  specification consistent with the claims and should be

8  adopted.

9            Finally, having considered what roles

10 are, considering associating roles with individual

11 metadata elements begs the question of what is an

12 individual metadata element?  For that I will turn to

13 one of the very first elements in the claims defining

14 metadata elements for an image because it answers that

15 question.

16            Defendants' proposed construction for

17 metadata elements for an image is a plurality of data

18 elements associated with and about an image other than

19 the image itself.

20            Now in Fotomedia's construction they used

21 the terms variable and data structure.  Defendants would

22 be amenable to including those terms as examples of data

23 elements in the construction.  So it would be, as an

24 alternative, a plurality of data elements, for example,

25 variables and data structures associated with and about

1  an image other than the image itself.

2            I should say right away that the

3  formulation associated with and about an image other

4  than the image itself is simply the parties now agreed

5  construction of what image metadata is at a general

6  level.  And so Defendants have simply incorporated that

7  understanding what metadata is at a more abstract level

8  into the construction and so there should be no dispute

9  about that.

10           Again, we're willing to include variables

11 and data structures as an example of data elements.  So

12 that should narrow the dispute a little bit more.  So it

13 really comes down to what are metadata elements?

14           Defendants propose simply using a

15 plurality of data elements to fill out the meaning of

16 that claim.  Very close to the plain language of the

17 claim.  We think that it reflects what one of ordinary

18 skill in the art would have understood it to be, and

19 reflects that there are a plurality of metadata

20 elements.

21           Indeed, the claim itself refers to

22 defining metadata elements, plural, for an image.

23 Defendants' construction reflects that.

24           What do we mean when we say data

25 elements?  Well, to fill it out a little bit, the

1  specification refers to metadata elements in the image

2  file that have been populated with data, so this is some

3  sort of storage data element -- this is some sort of

4  storage data element that is populated with the metadata

5  itself.

6              So again, we think that data elements

7  reflects that understanding.

8              What are some specific examples of what a

9  data element is?  Well, the patent refers to data

10 elements 120 here, seller name, property address,

11 street.  Seller name, that variable over data element,

12 is the metadata element.  The name, Gabe Ramsey, that

13 may be populated is the metadata.  That is the

14 distinction that we're attempting to capture in our

15 Defendants' proposed construction.

16             A couple of problems with Fotomedia's

17 construction here as a label or tag for image metadata

18 such as a variable or data structure.

19             First of all Fotomedia's construction

20 does not account for the plural metadata elements in the

21 plain language of the claims.  Instead it is phrased in

22 the singular, it is inconsistent with the claims for

23 that reason.

24             Second it is contrary to the plain

25 language of the claims in that it refers to information

1  for image metadata where the plain language of the claim

2  refers to metadata for an image.  In that way it is also

3  inconsistent with the plain language of the claims.

4          And finally, it uses these tags and

5  labels which quite frankly it's not -- it's not clear

6  exactly how they are using those in the construction.

7  It just adds confusion, it diverges from the plain

8  language of the claims in a way that the Defendants'

9  construction does not.

10         And finally while the words tags and

11 labels are used throughout the specification in a couple

12 of places, when they are described the metadata elements

13 are described as something different from the tags or

14 labels.  For example, at Column 3, lines 30-31, there is

15 a reference to the metadata elements being stored in a

16 tag.  A tag is a piece of an image file that may have

17 some interaction with the metadata element at some --

18 some time in the processing, but does not define the

19 metadata element itself.

20         So that is -- that takes the terms that I

21 am going to address.  If Your Honor has any questions, I

22 can take them up or pass the podium here.

23         Thank you.

24         THE COURT:  Thank you.

25         MR. SACKSTEDER:  I'm pleased to still be

1    able to say good morning, Your Honor.  I'm Michael

2    Sacksteder from Fenwick and West.  I represent

3    Shutterfly and speaking on behalf of the Defendants.

4                    THE COURT:  He has left you 15 minutes.

5                    MR. SACKSTEDER:  Thank you very much,

6    Your Honor.  That gives me 15 minutes to try to convince

7    the Court to invalidate three claims, that's five

8    minutes per claim.  But that's made a little bit --

9                    THE COURT:  It's going to take you 15

10   minutes to do that?

11                   MR. SACKSTEDER:  I don't think it will,

12   actually, Your Honor.

13                   That is five minutes per claim, but it is

14   made a little bit easier because Claims 10 and 11 are

15   dependent claims and they incorporate the same

16   means-plus-function limitations as we are going to be

17   addressing here in Claim 9.

18                   Also for time purposes, although all five

19   means-plus-function limitations are addressed in the

20   papers, I'm going to focus on the means for defining

21   limitation and the means for receiving limitation.

22                   And to set the stage a little bit, we're

23   talking here about two different paragraphs of Section

24   112 of 35 USC.  Paragraph 2 talks about claims being

25   required to particularly point out and distinctly claim

1    the subject matter which the applicant regards as his

2    invention.  And when you have a means-plus-function

3    limitation under paragraph 6, then the corresponding

4    structure that is disclosed in the specification is

5    effectively part of the claim.  So when you're looking

6    at whether the claim is indefinite under paragraph 2,

7    you have to look not just at the claim language itself,

8    but also the corresponding structure and whether that is

9    definite.

10            As the Aristocrat Technologies case says,

11   in a computer implemented claim with a computer

12   implemented function, as these are, the algorithm

13   disclosed in the specification for performing the

14   function is the corresponding structure as it is used on

15   a general or specific purpose computer.

16            Aristocrat makes it very clear that

17   that's because general purpose computers can be used for

18   all kinds of different things and you can't just give

19   one of ordinary skill in the art the idea of what the

20   claim covers and what the limits of the claim are unless

21   you also disclose an algorithm for performing that.

22            This is something also that Judge Davis

23   last year recognized in the Alcatel case, and I have

24   copies of that which I will hand up.  I would prefer not

25   to take the time to do it right now, if that's okay.

1            And Judge Davis said that the -- talked

2   about a specific case where the specification did not

3   disclose sufficient structure where it simply described

4   the outcome of the claimed function, and does not

5   disclose a computer program to execute a particular

6   algorithm.  And like Mr. Kitchen, I have something about

7   the Court's Superspeed Vs. IBM case that I like very

8   much, and that's this Court's formulation of how to look

9   at this.  And Your Honor drew the distinction between

10  merely the result of the algorithm being disclosed,

11  which is not sufficient to make a claim definite, versus

12  how the algorithm performs that function.  I think that

13  is what we're going to be looking at here, and that is

14  the distinction.

15            Here on the two limitations that we're

16  talking about, the construction of the proposed -- or

17  the corresponding structure that we have from Fotomedia

18  is kind of a laundry list of different computer hardware

19  and software, a server, a database, an image file, a web

20  browser or software application, or combination of

21  portions thereof, or the structures described in Figures

22  2, 3 and 5 and the equivalents of the structures

23  thereof.  That's the means for defining metadata

24  elements and the means for receiving similarly a server,

25  a software application or portions, and the structure

1   described in Figure 1.

2             And that is an awful lot to say that it

3   is providing definiteness to one of ordinary skill in

4   the art.

5             And what I would like to do is direct the

6   Court to one more legal point.  Here there are two

7   problems with this.  One, there is no disclosure of an

8   algorithm for performing those functions at all.  And

9   two, the other problem is that even if there were

10  something that you could tease out as an algorithm, it

11  also has to be clearly linked to the performance of the

12  function.  And I don't think we see either of those

13  here.

14            So going first to the means for defining,

15  and what I'd like to do is direct the Court to what

16  Fotomedia said disclosed the algorithm here.  In this

17  one they identified two portions of the specification.

18  One talks -- and this is means for defining metadata

19  elements -- and one keeps talking about storing metadata

20  elements without describing how those metadata elements

21  are defined.  I suppose one could say that -- or they

22  could argue that defining and storing are the same

23  thing, but then they are not clearly linked, you won't

24  find that in the specification where this is a

25  disclosure for the structure for the means for defining

1  metadata elements.

2          So then there is one other citation to

3  the specification, and here it is a long portion from

4  the initial section of the patent, and it talks about

5  how well there are standards organizations that have

6  different metadata items that they may want to use or a

7  user might want to put something in with the users

8  pictures.  The trouble with this is -- well, there are a

9  number of troubles.  One, it's just the result, you

10  know, it's not the method for performing an algorithm.

11  Two, it's not something that's performed by any of those

12  structures that were identified.  This is talking about

13  things that are done by a standards organization and

14  things that are done by a user.  It has nothing to do

15  with what a server does or what the software does.  It

16  just talks about what either a group of humans or

17  individual humans have done.

18          So, those are the principal problems,

19  there are also identification of these figures.  This is

20  just a data structure where data is stored.  That is a

21  result.  Figure 3 is actually a blow out of a component

22  of Figure 2, that is another structure that is another

23  result, it's not an algorithm for obtaining the result.

24  Figure 5 is once again -- it's described in the

25  specification as an example set of metadata and roles

1  assigned to the metadata for use in a real estate

2  application.  Again, it's what you get coming out, it's

3  not how you get it.

4          The other limitation that I want to

5  address is the means for receiving a request for access

6  to the metadata by a particular user wherein the user's

7  role is determined from the request.  On this one, the

8  structure is a little bit different.  It is a server, a

9  software application or portions or combinations

10 thereof, or the structures described in Figure 1 and the

11 equivalents of the structures thereof.  Again, not

12 particularly definite even in and of itself.

13         The reference to Figure 1 is interesting

14 because it is the -- pretty much the entire internet

15 including both ends of this system.  It describes one

16 possible system environment for performing all of this.

17 Again, it doesn't show how any of this is done, how the

18 function of receiving is performed.

19         There are a couple of portions from the

20 specification again that describe what Fotomedia says

21 are the corresponding structures of the algorithms

22 performed by the corresponding structures to the means

23 for receiving.  This one, all it says is there's a

24 gateway server for receiving the images.  It doesn't say

25 anything about any algorithm performed by that server

1  for receiving the images.  Basically, the same thing

2  here.  These are all of the portions of the

3  specification that are identified by Fotomedia for

4  performing the function of receiving.  So, there is no

5  disclosure of any algorithm for receiving a request for

6  access to metadata.

7           The other thing there isn't is any

8  disclosure of any structure or algorithm for determining

9  a user's role from the request.  That is no where in

10  Fotomedia's briefing.  That is a part of the plain

11  language of the limitation, there is simply nothing

12  disclosed.

13           So it is the Defendants' contention that

14  these deficiencies in the corresponding structures or

15  what are purported to be the corresponding structures,

16  render Claims 9 through 11 indefinite and thus invalid.

17           Thank you.

18           THE COURT:  Thank you.  And thank you for

19  the time back.

20           Mr. Baker always used up all of his time.

21  I am being facetious.

22           MR. SHUMAKER:  Good morning again, Your

23  Honor.

24           THE COURT:  Good morning.

25           MR. SHUMAKER:  I am not going to bore the

1  Court with just regurgitating the arguments we have in

2  our brief.  So I direct the Court to Plaintiff's opening

3  brief and reply brief for the arguments in support of

4  its constructions.

5              But what I want to discuss in the next

6  few minutes is just really a high level rebuttal to some

7  of the points that the Defendants brought up in their

8  presentation.

9              Mr. Martin, could you please bring up my

10 presentation, please?

11             The first issue I want to address is the

12 Wright prior art reference issue, and there were two

13 real main points.  One, counsel for Defendants

14 recognized that the prosecution history related to the

15 amendment stemming from the discussion about the Wright

16 reference was ambiguous and not clear.  I think that is

17 critical because in order to find a disclaimer in the

18 prosecution history, that disclaimer must be clear and

19 unambiguous.  I submit that given the admission by

20 Defendants' counsel, the prosecution history related to

21 the Wright reference is not clear and not unambiguous

22 and therefore under the controlling law, the statements

23 made in the prosecution history cannot be a clear

24 disclaimer of claim scope.

25             Furthermore, the statements made in the

1 prosecution history related to the type of image that

2 was received rather than the step of the user sending

3 that image.

4             Next I want to address the argument about

5 a personal computer and can a personal computer -- or

6 I'm sorry, must a computer be limited to a personal

7 computer, and was there any disclosure in the

8 prosecution history related to the scope of a personal

9 computer.

10             Mr. Martin, could you please bring up

11 Slide No. 11, please.

12             Slide No. 11 is a discussion of the '005

13 patent which was at issue in the prosecution history.

14 Interestingly, what the Examiner brought up was a

15 reference which discloses a video camera connected to a

16 CPU, having an image memory, a modem, and a cellular

17 telephone transmitter.

18             What this figure shows is that in the

19 prosecution history it was recognized that a video

20 camera could be coupled to a computer through a CPU and

21 then further coupled to a cellular telephone

22 transmitter, and the resulting image can then be sent

23 out from the device that is found in the '005 patent.

24 So what I want to present to you today is that in the

25 prosecution history it is fairly clear that there were

1  computers not specifically limited to a personal

2  computer, but a computer that could capture an image and

3  also transmit that image through a cellular telephone

4  transmitter, pretty close to a cell phone with a camera.

5          The next issue I want to address is the

6  issue of a server.  Is that one server?  Is it one or

7  more servers?  There are quite a few issues related to

8  that term today.

9          First of all I would like to mention at

10 the outset that what is really being construed is the

11 term a.  Does a mean one or more?  Or does a only mean

12 one?  The term server has not been construed.  So

13 although today we're talking about a server meaning a

14 single server, given the parties' constructions is

15 probably going to be a dispute in the future as to what

16 is the definition of a server.

17         Now servers back in the 1996 time frame,

18 although disclosed in the --

19         THE COURT:  You're not suggesting

20 somebody would try to end run a claim construction with

21 an infringement or noninfringement argument, are you?

22         MR. SHUMAKER:  I am just saying the term

23 server itself could be a term for disagreement.  Why do

24 I say that?  Because does a server relate to a single

25 box server or does it relate to a rack of servers?  And

1   is a rack of servers a single server or is it not?  I am

2   just suggesting that the term that we're actually

3   construing, a, does it mean one or more?  Or does it

4   just mean one?  It may not actually capture the dispute

5   that the parties have right here because I believe the

6   real dispute is what is the construction of server?  And

7   now once you determine what the construction of server

8   is, is there one of those devices or is there one or

9   more of those devices?

10                  And I would argue that back in the 1996

11  time frame that the distributive computing environment

12  was known, it wasn't an area of research, and I would

13  also submit that if you go back in 1996 to look at

14  servers that existed at that time, they weren't all

15  limited to a stand-alone PC box.  But again, that is

16  going to be an issue, I believe, of expert testimony,

17  and according to the expert, what is the scope of a

18  server back in 1996.  I just wanted to bring out the

19  issue that the term that we're disputing right now, does

20  a mean one or more, actually doesn't address, I think,

21  the corresponding issue which I believe the parties are

22  going to dispute eventually as to what is the

23  construction of a server.

24                  Now getting back to actually the argument

25  of should a mean one or more or not?  Clearly under the

1   law in order to limit a to only one, there must be a

2   clear intent evinced in the prosecution history.  Now,

3   what is the argument for clear intent?

4            Let's look at the claim language.  The

5   claim language says a server and there is also a

6   corresponding claim language that says at least one --

7            Mr. Martin, you can go on and pull off

8   this slide.

9            -- at least one CPU.  And Your Honor

10  brought up the question, well, if the applicants knew

11  how to interpret a and also how to interpret at least

12  one, why did the applicant use a in one situation and at

13  least one in another situation and intend those two

14  phrases to mean exactly the same thing?

15            Well, I think one way to answer that

16  question is let's look at the term at least one CPU,

17  which is found in Claim 1 of the '936 patent.  What does

18  that term connote?  Well, it connotes at least one CPU

19  which implies there's two situations.  One, you have a

20  multiprocessor computer which has more than one CPU in

21  the box.  Or you could have a distributed computer

22  system where you have more than one server or more than

23  one server computer and because you have more than one

24  server, you have more than one CPU.  So the claim

25  language at least one CPU, I believe, refers to -- or

1  connotes the concept of a single computer having a

2  multiprocessor architecture or a distributed computer

3  environment.  I think that is precisely why the

4  applicants used the term at least one CPU in the claim

5  language and also used the term a server in the claim

6  language.

7                    THE COURT:  And were servers with the

8  dual processors, those were used in '96?

9                    MR. SHUMAKER:  I believe so because when

10  I was in grad school back in 1991, I used a

11  multiprocessor computer, so yes, I would certainly

12  suggest in 1996 --

13                    THE COURT:  I don't know, my time line is

14  a little fuzzy.

15                    MR. SHUMAKER:  I would represent that in

16  1996 that I believe those computers existed, but again,

17  that is going to be an area for experts, not obviously

18  for attorney argument.

19                    Which brings me to another interesting

20  issue.  The Defendants in a large number of their

21  constructions pointed to the testimony of inventors,

22  Neal Mayle.  Now under Federal Circuit law it is clear

23  that inventor testimony is absolutely irrelevant to

24  claim construction, and the Court cannot put any weight

25  to any inventor testimony for claim construction.

1              Mr. Martin, could you please pull up --

2 let me -- I have it here some place.

3              MR. MANLEY:  Do you want the Howmedica

4 case?

5              MR. SHUMAKER:  Yes, the Howmedica case.

6              MR. MANLEY:  There it is.

7              MR. SHUMAKER:  Oh, it is right there.

8 Okay.

9              So under the Howmedica case it is clear

10 that inventor testimony as to the subjective intent is

11 irrelevant.  So what the inventor testifies regarding

12 the scope of the invention, doesn't have an influence on

13 the actual scope of the claims that we're talking about

14 today.  What the Howmedica case also said is, well, if

15 the inventor is also an expert, then his testimony can

16 be related to expert testimony.  There is no suggestion

17 today that the inventor was an expert or was presented

18 as expert testimony.  His deposition was solely for

19 inventor testimony.  And because it was an inventor

20 deposition, his testimony is not relevant for claim

21 construction purposes today.

22              Another issue with respect to the

23 construction of a server.  Part of the claim language

24 we're pointing to when we talk -- when we point to at

25 least one CPU refers to Claim 1 of the '936 patent which

1  was issued after the '774 patent.  And the parties have

2  agreed to construe a server to be consistent across the

3  '774 patent and the '936 patent, and therefore it's not

4  appropriate to somehow link language introduced after a

5  claim was issued to thereafter narrow that issued claim

6  language.

7            Next I am going to talk about image

8  metadata and I believe when Your Honor asked me a

9  question about the definition of metadata, I was

10  referring to the definition -- we're looking to the

11  definition of metadata in the prosecution history.

12  Well, the parties have actually agreed upon the

13  definition of image metadata in this case.  And the

14  parties agreed that image metadata should mean

15  information associated with and about the image other

16  than the image itself.

17            In the Defendants' arguments regarding

18  the, quote, scope of the invention, there was quite a

19  few references made to electronic postcard, and the

20  Defendants pointed to the fact that this invention was

21  related to electronic postcard.  I would like to point

22  Your Honor back to the summary of the invention and I'll

23  submit to you that the summary of the invention does not

24  limit the invention to electronic postcard.  It's a much

25  more broadly claimed invention than electronic postcard.

1                Now I want to address roles.  I believe

2    the parties' constructions are actually fairly similar.

3    The only dispute Fotomedia has is does the term

4    intermediary designations make any sense?  We submit

5    that it doesn't.  Either roles should be an intermediary

6    or a designation, but the combination of those two terms

7    renders the Defendants' construction ambiguous and

8    vague.

9                One last issue I want to address and

10   that's the issue of the uniqueness concept in the URL,

11   what does it mean to be unique?  The Plaintiff's

12   position is that the URL itself must not be linked

13   inexorably to a single image, and Fotomedia believes

14   that Defendants' construction could cause a jury to

15   believe that a unique URL must be tied to a single

16   image, not to multiple images.

17                And one last term.  The term a display

18   that under the Defendants' construction a display is

19   construed in the context of a fixed display -- or a

20   fixed image, excuse me.  And I think that is not correct

21   according to the intrinsic evidence.  Because what the

22   intrinsic evidence states is that the display can

23   include fixed images, but a display is not itself

24   limited to a fixed image.  Moreover in the

25   specification, a discussion of a fixed image relates to

1  the efficiency of the invention rather than the actual

2  steps performed by the invention.  The reason the

3  applicants disclosed a fixed image was to enhance the

4  download speed of the electronic postcard because if an

5  image didn't change, there was no reason to download

6  that image for the second time.  If the image changed

7  and it was no longer fixed, then the image itself was

8  downloaded.  But the concept of fixed really was related

9  to efficiency purposes of the invention and not the

10  actual steps that were claimed by the invention.  And

11  furthermore a GIF image can be animated, and an animated

12  GIF image, is that a fixed image or is that not a fixed

13  image?  I don't know the answer to that question, and I

14  suspect that we're going to get varying answers to that

15  question because the image itself can move, it can be

16  animated.  So in some sense that is not fixed, but if

17  you look at the underlying data, does that change or

18  not?  And I think there is two different levels of

19  abstraction that will be at issue when we discuss a

20  fixed image that could be an animated GIF image, which

21  is another reason why Defendants' construction for

22  display is incorrect.

23          And with that, I thank Your Honor for

24  your attention and the Plaintiffs are done.

25              THE COURT:  Thank you.

1          Thank you for the arguments and the very

2    good briefing on the points.  I will get you an order as

3    soon as I can.  The claim construction issue is under

4    submission.

5               COURT SECURITY OFFICER:  All rise.

6               (Court adjourned.)

7               *      *      *      *

8

9

10               C E R T I F I C A T I O N

11

12          I HEREBY CERTIFY that the foregoing is a

13    correct transcript from the stenographic notes of the

14    proceedings in the above-entitled matter to the best of

15    my ability.

16

17

18

19

20    _____          _____
      SUSAN SIMMONS, CSR                          Date
21    Official Court Reporter
      State of Texas No.:  267
22    Expiration Date:  12/31/08

23

24

25